# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### October 27, 2015 Session

## AKILAH LOUISE WOFFORD, ET AL. v. M. J. EDWARDS & SONS FUNERAL HOME INC, ET AL.

**Appeal from the Chancery Court for Shelby County**
**No. CH140197     Jim Kyle, Chancellor**

_____

**No. W2015-00092-COA-R3-CV – Filed November 23, 2015**
_____

This appeal concerns the enforceability of an agreement to arbitrate a dispute between a consumer and funeral home. The trial court refused to compel arbitration, finding no meeting of the minds as to the arbitration agreement. On appeal, the funeral home argues that this Court should consider not only the signed agreement, but also another document allegedly incorporated by reference into the parties' contract in compelling arbitration. We hold: (1) the additional document providing details regarding arbitration was not incorporated by reference into the parties' contract; and (2) the arbitration provision actually contained in the parties' contract is unenforceable because it is beyond the expectations of an ordinary person. Affirmed and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., and BRANDON O. GIBSON, J., joined.

John R. Branson, Jacob A. Dickerson, and Austin K. Purvis, Memphis, Tennessee, for the appellants, M.J. Edwards & Sons Funeral Home, Inc.

Kathryn E. Barnett, Nashville, Tennessee, for the appellee, Akilah Louise Wofford.

## OPINION

## Background

Plaintiff/Appellee Akilah Wofford's father, L.C. Wofford, died on June 10, 2013 after suffering a heart attack in his yard. Ms. Wofford, who graduated from high school in 2008, was a college student at the time of her father's death. She was raised by her father. When her father passed away, her aunt assisted her with making the funeral arrangements. The family contacted Defendant/Appellant M.J. Edwards & Sons Funeral Home, Inc. ("Edwards") to arrange the funeral services.[1]

Edwards took possession of Mr. Wofford's body on June 10, 2013. Edwards subsequently began the process of securing life insurance proceeds to cover the cost of services. By June 11, 2013, Edwards had embalmed the body, worked with the family to publish an obituary, and procured a death certificate. It appears that most of the planning decisions regarding the services and burial had been made by June 11, 2013. Indeed, Edwards placed an internal order for the casket on that day. Also on June 11, 2013, Ms. Wofford and Edwards entered into certain discussions regarding the services and agreed to a document entitled "Statement of Funeral Goods and Services." There is no dispute that this document does not contain an arbitration provision. Moreover, no one from Edwards discussed arbitration with Ms. Wofford on June 11, 2013.

On June 12, 2013, Edwards asked Ms. Wofford to return to complete the final paperwork. On this day, Ms. Wofford signed a purchase agreement ("Contract"). The Contract contained the prices for each service that Edwards provided. On the bottom of the second page of the Contract, directly above Ms. Wofford's signature, is the following language in bold type:

> NOTICES TO PURCHASER/CO-PURCHASER
>
> SEE PART THREE FOR TERMS AND CONDITIONS THAT ARE PART OF THIS AGREEMENT. DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACES. YOU ACKNOWLEDGE RECIEPT OF AN EXACT COPY OF THIS AGREEMENT.
>
> BY SIGNING THIS AGREEMENT, YOU ARE AGREEING THAT ANY CLAIM YOU MAY HAVE AGAINST THE SELLER SHALL BE RESOLVED BY ARBITRATION AND

---

[1] In its brief, Edwards asserts that the proper name for Edwards is M.J. Edwards-Hillside Chapel, Inc., d/b/a M.J. Edwards Funeral Home Stage Road Chapel. Throughout the proceedings, however, the party named as a defendant has been M.J. Edwards & Sons Funeral Home, Inc. There does not appear to be a dispute that regardless of the legal name of Edwards, the current defendant is the real party in interest. Accordingly, we will utilize the name contained in the caption of the trial court proceedings.

YOU ARE GIVING UP YOUR RIGHT TO A COURT OR
JURY TRIAL, AS WELL AS YOUR RIGHT OF APPEAL.

It is undisputed for purposes of this appeal that Ms. Wofford was not provided a copy of Part 3 of the Contract.[2] Part 3 of the Contract, however, provides:

> ARBITRATION: YOU AGREE THAT ANY CLAIM YOU MAY HAVE RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT (INCLUDING ANY CLAIM OR CONTROVERSY REGARDING THE INTERPRETATION OF THIS ARBITRATION CLAUSE) SHALL BE SUBMITTED TO AND FINALLY RESOLVED BY MANDATORY AND BINDING ARBITRATION IN ACCORDANCE WITH THE APPLICABLE RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA"); PROVIDED, HOWEVER, THAT THE FOREGOING REFERENCE TO THE AAA RULES SHALL BE DEEMED TO REQUIRE ANY FILING WITH THAT ORGANIZATION, NOR ANY DIRECT INVOLVEMENT WITH THAT ORGANIZATION. THE ARBITRATOR SHALL BE SELECTED BY MUTUAL AGREEMENT OF THE PARTIES. IF THE PARTIES FAIL TO OR UNABLE TO AGREE ON THE SELECTION OF AN APPROPRIATE ARBITRATOR, THE AAA SHALL SELECT THE ARBITRATOR PURSUANT TO ITS RULES AND PROCEDURES UPON THE APPLICATION OF ONE OR BOTH PARTIES. . . .

Ms. Wofford admits that she only read the portion of the Contract containing the prices to ensure they were correct. According to Ms. Wofford, she signed the second page of the Contract without reading all its terms, including the reference to Part 3 of the Contract or the provision regarding arbitration. The arrangements for Ms. Wofford's father were carried out by Edwards as planned, and the family was apparently satisfied with the services provided by Edwards. Ms. Wofford's father's body was interred at Galilee Memorial Gardens cemetery.

Eventually, allegations came to light that Galilee Memorial Gardens was improperly handling and disposing of human remains. Accordingly, on February 9, 2014, Ms. Wofford, along with three other named plaintiffs and all similarly situated persons, filed a Class Action

---

[2] In its appellate brief and at oral argument, Edwards concedes that it has no evidence, documentary or testimonial, to support a finding that Ms. Wofford was provided Parts 3 and 4 of the Contract. Additionally, evidence from Cedric Collins, the funeral director and manager of Edwards, indicates that Edwards was not providing Parts 3 and 4 of the Contract to any of its customers during this time period.

Complaint in the Chancery Court of Shelby County against Edwards, Galilee Memorial Gardens and related entities (collectively, "Galilee Memorial Gardens"),[3] and a number of other unrelated funeral homes.[4] The complaint was subsequently amended on March 3, 2014. Specifically with regard to the defendant-funeral homes, the amended complaint alleged that the defendant-funeral homes breached a duty to the plaintiff-customers in failing to supervise burials and ensure that the burials of those entrusted to their care was "accomplished in a proper fashion." Only the allegations against Edwards are at issue in this appeal.

On March 19, 2014, Edwards filed a motion to compel arbitration and to stay proceedings pending the outcome of arbitration. On the same day, Edwards also filed its answer, which preserved its right to compel arbitration. Ms. Wofford and the other plaintiffs filed a Second Amended Complaint on April 25, 2014.[5] Edwards similarly responded to this complaint. Ms. Wofford and Edwards agreed to limit discovery at this juncture to the issue of arbitration. The parties took the depositions of both Ms. Wofford and Cedric Collins, the funeral director and manager of Edwards. Both depositions were filed in the trial court on December 4, 2014.

On December 8, 2014, the trial court heard oral argument on the motion to compel arbitration. At the conclusion of the hearing, the trial court ruled that there was not sufficient notice to Ms. Wofford that she was agreeing to arbitrate her claims against Edwards. According to the trial court:

> What I do find interesting in this whole proposition is the
> contract. And on Page 2 of the contract, Ms. Wofford signs.
> Generally speaking, most folks sign contracts at the end of the

---

[3] These entities include JM&M Services, Inc., Lambert Memorial Co., a/k/a Lambert Memorials, Inc., Lambert and Sons, Inc. and its principals, Jemar Lambert, Marje Lambert, and Mary Lambert, as well as the Tennessee Commissioner of Commerce and Insurance, in its capacity as receiver for Galilee Memorial Gardens.

[4] These funeral homes include N.J. Ford and Sons Funeral Home Inc. and Christian Funeral Directors, Inc., d/b/a Christian Funeral Directors South East, in addition to unnamed funeral homes and directors.

[5] The April 25, 2014 Amended Complaint added as additional named defendants E.H. Ford Mortuary Services, Inc.; Joseph Sampson Ford, individually and d/b/a Joe Ford Funeral Home; James E. Herndon, III, individually and d/b/a J.E. Herndon Funeral Home, LLC; Casey M. Sanders, individually and d/b/a Hardeman County Funeral Service; Signature Funeral Services, LLC; Vernal H. Bins Jr., individually and d/b/a V.H. Bins and Son Funeral Home, Inc.; R.S. Lewis Funeral Home LLC; Durell Antoine Williams, individually and d/b/a Calvary Memorial Funeral Home; Family Mortuary Inc.; Harrison's Funeral Home, Inc.; Preston Jefferson, individually and d/b/a Jefferson Mortuary; Millington Funeral Home, Inc.; and SLS, LLS, d/b/a Superior Funeral Home Hollywood Chapel.

4

contract. But this isn't the end of the contract. There is another page of the contract, a page which we don't have. We know what it would say if it was added. There's no proof to the contrary that Ms. Wofford -- that those pages are missing. Three and four are missing.

Generally speaking, I would say that y'all can correct me -- but most folks have an expectation that when you sign the document, that that's the document to which you are being bound by. Now, Page 2 does say, Part Three is on the way; you need to pay attention to what's on Part Three. And by signing this agreement, you are subject to arbitration. That's right above their signature, well below the price.

And that is what is in my mind the determining factor as to the set of the facts as to whether or not this contract was enforceable based upon the ability of the parties to understand that which they were agreeing to. If there had not been a Page 3 at all and it simply had that simple sentence that says, you have to be in arbitration, I'm not really sure that the law would say that that is sufficient notice of the rights one has under arbitration.

Consequently, I'm going to deny the motion for arbitration, and we will proceed with the litigation accordingly.

On December 16, 2014, the trial court entered a written order denying the motion to compel arbitration, incorporating by reference its oral ruling.

On December 19, 2014, Edwards filed a motion to stay litigation pending the outcome of Edwards's appeal of the decision on the arbitration issue. On January 9, 2015, the parties argued the motion for a stay before the trial court. At the conclusion of the hearing, the trial court denied the motion and reiterated its decision regarding the denial of the motion to compel arbitration. Specifically, the trial court stated:

This Court's authority to rule on this matter comes from the Constitution as ratified by the people. Yet, there are other ways to resolve disputes. And arbitration is one of the ways. It is a favored way. But whether a party participates in arbitration or not is where a party consented to participate in arbitration through a contract that says that we have a dispute; we will resolve that dispute, not through the court system, but through arbitration.

5

It's been long held in the state in Davidson versus Martin Marietta Energy at 797 Fed. Supplement 613 that arbitration is a matter of contract, and a party cannot be required to arbitrate any dispute which he has not agreed to submit. Also, in French versus First Union Securities, federal case Fed. Supplement 818: Since arbitration agreements are creatures of contract, a party cannot be required to submit to arbitration unless he or she has agreed to do so.

The Court's ruling -- and perhaps the Court wasn't clear in previous proceedings – was that this Court has not ruled that this matter is appropriate for arbitration. This Court hasn't ruled that the arbitration agreement follows – is an appropriate document that would cover this type of injury. This Court hasn't ruled that this type of damage claim is subject or appropriate for arbitration.

What this Court has ruled is by the clear facts of the case that the parties never had a meeting of the minds and never had a contract to order arbitration, to go to arbitration. The most damaging fact is that the plaintiff signed the contract on Page 2 and that it was a four-page contract.

And as stated again today, there cannot be any -- while there [are] statements concerning arbitration, describing what arbitration is and how it will work is on the page of a contract which the Edwards company cannot, as stated again today, cannot state that the plaintiff even got.

So I haven't gotten to whether this is right to arbitration or not right to arbitration or appropriate for arbitration or inappropriate for arbitration. I'm simply stating there is not a contract to compel arbitration, and therefore, there was no meeting of the minds.

The trial court thereafter denied the motion to stay by written order entered January 15, 2015. Edwards timely appealed the denial of its motion to compel arbitration, invoking its statutory right to appeal pursuant to Tennessee Code Annotated Section 29-5-319.

While this appeal was pending, on February 5, 2015, Edwards filed a motion in this Court to stay the proceedings in the trial court pending resolution of this appeal. Ms. Wofford

6

responded in opposition to the motion, but it was eventually granted on February 25, 2015, as to the claims against Edwards only.[6]

## Issue Presented

Edwards raises one issue in this appeal: Whether the trial court erred in denying Edwards's motion to compel arbitration?

## Standard of Review

When the facts are not disputed, we review the denial of a motion to compel arbitration *de novo*, with no presumption of correctness in the trial court's decision. *See Owens v. Nat'l Health Corp.*, 263 S.W.3d 876, 882 (Tenn. 2007). In this case, the underlying facts surrounding the Contract and Ms. Wofford's execution are undisputed. The only questions concern whether there was mutual assent to arbitration and whether the arbitration provision was unconscionable. "The issue of whether an arbitration clause is unconscionable under applicable contract principles is also a question of law, subject to de novo review." *Berent v. CMH Homes, Inc.*, 466 S.W.3d 740, 745 (Tenn. 2015). In contrast, "[w]hether a meeting of the minds occurred is a question of fact." *Harvey v. Turner*, No. M2014-00368-COA-R3-CV, 2015 WL 1451702, at *6 (Tenn. Ct. App. Mar. 26, 2015), *perm. app. denied* (Tenn. Aug. 14, 2015) (quoting *In re Estate of Josephson*, No. M2011-01792-COA-R3CV, 2012 WL 3984613, at *2 (Tenn. Ct. App. Sept. 11, 2012) (citing 17B C.J.S. *Contracts* § 1008 (2012)). However, "when a trial court is called upon to make a finding of fact based on uncontroverted evidence, its conclusion is one of law, and the appellate courts will review that finding as a question of law." *Executone of Memphis, Inc. v. Garner*, 650 S.W.2d 734, 736 (Tenn. 1983) (citing *Billington v. Crowder*, 553 S.W.2d 590, 595 (Tenn. Ct. App. 1977);

---

[6] Also during the pendency of this appeal, the parties filed no less than four supplemental authorities pursuant to Rule 27 of the Tennessee Rules of Appellate Procedure. Rule 27 provides:

> When pertinent and significant authorities come to the attention of a party after the party's brief has been filed, or after oral argument but before decision, a party may promptly advise the clerk of the court, by letter, extra copies to the clerk for each judge of the appellate court, and a copy to all other parties, setting forth the citations. There shall be a reference either to the page of the brief or to a point argued orally to which the citations pertain, but the letter shall without argument state the reasons for the supplemental citation. Any response shall be made promptly and shall be similarly limited.

Rule 27 places no express limit on the number of supplemental authorities that may be filed after briefing is completed. While some of the cases cited in supplemental authorities were issued after briefing was completed, several of the authorities were issued prior to briefing being completed in this case (some as early as 1982). Unless new authority is issued, parties should endeavor to include all relevant material in their initial briefs to this Court.

*Continental Ins. Co. v. Cooper*, 58 Tenn. App. 316, 430 S.W.2d 661 (Tenn. Ct. App. 1968)); *see also **Allman v. Boner***, No. 01A01-9306-CH-00270, 1993 WL 541111, at *1 (Tenn. Ct. App. Dec. 29, 1993). Accordingly, our review is *de novo* in this case.

## Analysis

The crux of this appeal is whether Ms. Wofford is required to arbitrate her claim against Edwards. We first look to Tennessee law concerning the enforcement and interpretation of agreements to arbitrate.[7] Arbitration is judicially and legislatively favored in Tennessee. *See generally **Buraczynski v. Eyring***, 919 S.W.2d 314, 317 (Tenn. 1996) According to the Tennessee Uniform Arbitration Act ("TUAA"):

> A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between parties is valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the revocation of any contract; provided, that for contracts relating to farm property, structures or goods, or to property or structures utilized as a residence of a

---

[7] The parties exclusively relied upon Tennessee law in the trial court and their appellate briefs. At oral argument, counsel for Edwards asserted, for the first time, that application of federal law may be appropriate under the Federal Arbitration Act ("FAA") because funeral homes such as Edwards are subject to federal regulations. *See **Serv. Corp. Int'l v. Lopez***, 162 S.W.3d 801, 807 (Tex. Ct. App. 2005) (holding that a funeral services contract is governed by the FAA because funeral services are governed by federal law); ***Serv. Corp. Int'l v. Fulmer***, 883 So. 2d 621, 630 (Ala. 2003) (same). Generally, arguments that are raised for the first time on appeal are waived, *see **Welch v. Bd. of Prof'l Responsibility for the Supreme Court of Tenn.***, 193 S.W.3d 457, 465 (Tenn. 2006), unless the arguments question the court's subject matter jurisdiction. *See **Landers v. Jones***, 872 S.W.2d 674, 675 (Tenn. 1994). Other courts have previously held that arguments regarding the applicability of the FAA were waived by the parties by their failure to raise the arguments at trial. *See **Estate of Blanchard ex rel. Blanchard v. Cent. Park Lodges (Tarpon Springs), Inc.***, 805 So. 2d 6, 10 (Fla. Dist. Ct. App. 2001) (noting that the parties attempt to "couch[] its argument in terms of subject matter jurisdiction" was merely an attempt to avoid waiver); ***Cable Connection, Inc. v. DIRECTV, Inc.***, 44 Cal. 4th 1334, 1350, 190 P.3d 586, 597 (Cal. 2008) (holding that party waived argument that judicial review of an arbitration award should be governed by the FAA by failing to raise the argument in the trial court or in its appellate brief); *see also **Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.***, 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 942, n. 32, 74 L.Ed.2d 765 (1983) (holding that the FAA does not confer an independent basis for subject matter jurisdiction in federal courts). Furthermore, Tennessee clearly has subject matter jurisdiction to consider a motion to compel arbitration in a common law tort case irrespective of whether federal or Tennessee law will determine the arbitration issue. *See **Frizzell Constr. Co. v. Gatlinburg, L.L.C.***, 9 S.W.3d 79, 84 (Tenn. 1999) (considering a motion to compel arbitration under the FAA); ***Mid-S. Maint. Inc. v. Paychex Inc.***, No. W2014-02329-COA-R3-CV, 2015 WL 4880855, at *5 (Tenn. Ct. App. Aug. 14, 2015) (considering a case that is governed by the FAA and New York law). Thus, we conclude that Edwards's argument regarding the applicability of the FAA was waived by its failure to raise this issue in the trial court or in its brief.

party, the clause providing for arbitration shall be additionally signed or initialed by the parties.

Tenn. Code Ann. § 29-5-302(a). Further, as explained by this Court:

> In permitting and indeed encouraging arbitration of disputes, the legislature sought to facilitate and promote a quicker, more cost effective, less cumbersome, yet binding means of dispute resolution. ***Buraczynski***, 919 S.W.2d at 317; ***Dewitt v. Al-Haddad***, No. 89-394-II, 1990 WL 50727, at *7 (Tenn. Ct. App. April 25, 1990) (no perm. app. filed). An agreement to arbitrate does not affect the rights and duties of the parties. It simply shifts the forum of dispute settlement. ***Buraczynski***, 919 S.W.2d at 319. Unless a contract containing the arbitration clause is otherwise revocable upon grounds existing at law or in equity, such as fraud or unconscionability, the terms of an arbitration provision are binding on the parties. ***D & E Constr. Co. v. Robert J. Denley Co.***, 38 S.W.3d 513, 518 (Tenn. 2001); *see* ***Buraczynski***, 919 S.W.2d at 320. Additionally, section 29-5-303(a) requires that where parties have become bound by a written agreement to arbitrate disputes between them, and one party refuses to arbitrate, "the court shall order the parties to proceed with arbitration, but if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party. . . ." Tenn. Code Ann. § 29-5-303(a)(2000) (emphasis added). Thus if the court finds a valid written agreement to arbitrate, whether to order the parties into arbitration is not a matter of discretion for the court, but is statutorily required.

***T.R. Mills Contractors, Inc. v. WRH Enters., LLC***, 93 S.W.3d 861, 868 (Tenn. Ct. App. 2002).

Despite the favorability of arbitration agreements, parties "cannot be forced to arbitrate claims that they did not agree to arbitrate." ***Frizzell Constr. Co. v. Gatlinburg, L.L.C.***, 9 S.W.3d 79, 84 (Tenn. 1999) (involving a contract under the FAA, but applying "ordinary state-law principles" to issues of contract formation) (citing ***First Options***, 514 U.S. at 944). In "deciding whether parties agreed to arbitrate a particular issue," the court should "'ascertain the intention of the parties by a fair construction of the terms and provisions of the contract, by the subject matter to which it has reference, by the

circumstances of the particular transaction giving rise to the question, and by the construction placed on the agreement by the parties in carrying out its terms.'" *Frizzell*, 9 S.W.3d at 84 (quoting *Penske Truck Leasing Co. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn.1990)). "[W]hile courts are required to give an arbitration agreement 'as broad a construction as the words and intentions of the parties will allow', this applies to the scope of the agreement, and not whether grounds exist to deny enforceability of the agreement." *Howell v. NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731, 733 (Tenn. Ct. App. 2003) (citing *Urology Assocs., P.C. v. Cigna Healthcare of Tenn., Inc.*, No. M2001-02252-COA-R3-CV, 2002 WL 31302922, at *5 (Tenn. Ct. App. Oct. 11, 2002)). Accordingly, we must determine whether, applying ordinary contract-formation principles, an enforceable agreement to arbitrate existed between the parties.

## The Parties' Contract

From the record in the trial court, we can discern that that trial court denied Edwards's motion to compel arbitration because it concluded that notice provided by the Contract and the circumstances did not indicate that there was a meeting of the minds as to arbitration. The Tennessee Supreme Court has indeed held that mutual assent to a contract's material terms is an essential element of contract formation and enforcement:

> It is black letter law that in order for a contract to be consummated, the parties must mutually assent to the material terms. *See* Arthur M. Kaufman & Ross M. Babbitt, *The Mutuality Doctrine in the Arbitration Agreements: The Elephant in the Road*, 22 Franchise L.J. 101, 102 (2002). Tennessee courts have referred to this requirement as a "meeting of the minds." *Staubach Retail Servs.-S.E., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005) (quoting *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). A meeting of the minds is determined "by assessing the parties' manifestations according to an objective standard." *Moody Realty Co. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007); *see also Paragon Refining Co. v. Lee*, 98 Tenn. 643, 644–49, 41 S.W. 362, 363–64 (1897); *Black's Law Dictionary* 124 (8th ed. 2004) ("In modern contract law, mutual assent is determined by an objective standard—that is, by the apparent intention of the parties as manifested by their actions."). The traditional common-law rule is that where mutual assent is lacking, no contract was ever formed. *See Higgins v. Oil, Chem. & Atomic Workers Int'l Union, Local No. 3-677*, 811 S.W.2d 875, 879 (Tenn. 1991) ("The facts of this case,

> plainly and simply, fail to establish mutual assent. Hence, no
> contract between the parties ever arose."); *accord Restatement
> (Second) of Contracts* § 17 & cmt. c (1981); *see generally* 21
> Steven W. Feldman, *Tennessee Practice: Contract Law and
> Practice* § 4:5, at 277–78 (2006).

*Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 528 (Tenn. 2012).

In this case, Edwards argues that regardless of whether Ms. Wofford actually read the whole of the Contract, she is presumed to have done so and the Contract may be enforced against her, including Part 3. Indeed, this Court had repeatedly held that in the absence of fraud:

> [A]n individual who signs a contract is presumed to have read
> the contract and is bound by its contents. *See Giles v. Allstate
> Ins. Co.*, 871 S.W.2d 154, 157 (Tenn. Ct. App. 1993); *see also
> Beasley v. Metro. Life Ins. Co.*, 190 Tenn. 227, 229 S.W.2d
> 146, 148 (1950). To hold otherwise would make contracts not
> "'worth the paper on which they are written.'" *Beasley*, 229
> S.W.2d at 148 (quoting *Upton v. Tribilcock*, 91 U.S. 45, 50, 23
> L.Ed. 203 (1875)).

*84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011); *see also Giles*, 871 S.W.2d at 156 (indicating that the above presumption applies when there is no showing that the individual has been the "victim of fraud"). Because there are no allegations of fraud in this case, Edwards asks that this Court reverse the trial court's finding that there was no mutual assent to arbitration and, instead, enforce the arbitration provisions contained in both Parts 2 and 3 of the Contract.

To determine whether there was a meeting of the minds as to arbitration, we must first determine what documents constitute the Contract in this case. Stated another way, whether the parties had a meeting of the minds as to arbitration depends, in part, on whether Part 3 of the Contract was properly incorporated by reference. Here, there is no dispute that Ms. Wofford was provided, and signed, Part 2 of the Contract, which mentions arbitration clearly, but briefly. Edwards argues, however, that Ms. Wofford is also bound by Part 3 of the Contract because it was incorporated by reference into the signed Contract, regardless of the fact that Ms. Wofford was not presented with this part of the Contract. It is difficult to discern Ms. Wofford's position on this issue. In some parts of her appellate brief, Ms. Wofford discusses the terms of Part 3 of the Contract, giving the impression that Ms. Wofford concedes that Part 3 was properly included as part of the Contract. In other parts of her brief, however, Ms. Wofford appears to argue that this Court should disregard Part 3

because she was never provided with a copy of it. In an abundance of caution, we will consider whether Part 3 was properly considered part of the Contract.

We agree with Edwards that in the typical circumstance, additional writings or documents may be considered part of a contract as a whole where they are incorporated by reference into the document signed by the parties. As the Tennessee Supreme Court explained:

> Other writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by reference as a part of the contract and therefore, may be properly considered in the construction of the contract. Where a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties.
> Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect as between the parties themselves[.] And all persons charged with notice so that the intent of the parties may be carried out and the whole agreement actually made may be effectuated.

*McCall v. Towne Square, Inc*., 503 S.W.2d 180, 183 (Tenn. 1973) (quoting 17 Am.Jur.2d, Contracts § 263–65); *see also* 11 Williston on Contracts § 30:25 (4th ed.) ("Generally, all writings which are part of the same transaction are interpreted together.")). Thus, writings referred to in a written contract are incorporated by reference into the contract and generally will be considered as part of the agreement of the parties.

Here, Edwards cites several cases wherein this Court has held a party to the terms contained in other documents that were incorporated by reference into the document signed by the party seeking to avoid the contract. *See Lasco Inc. v. Inman Constr. Corp.*, 467 S.W.3d 467 (Tenn. Ct. App. 2015); *Robert J. Denley Co. v. Neal Smith Const. Co.*, No. W2006-00629-COA-R3CV, 2007 WL 1153121, at *1 (Tenn. Ct. App. Apr. 19, 2007); *T.R. Mills Contractors, Inc. v. WRH Enterprises, LLC*, 93 S.W.3d 861 (Tenn. Ct. App. 2002). Each of these cases, however, is materially different from the case-at-bar.

In all three cases, the agreements at issue involved large construction contracts between relatively sophisticated parties, rather than the consumer contract that is at issue in

this case.[8] *See Lasco*, 467 S.W.3d at 468 (involving a contract between a general contractor and subcontractor for the construction of a College of Pharmacy Building at the University of Tennessee Health Science Center); *Denley*, 2007 WL 1153121, at *1 (involving a contract between a contractor and a developer for the construction of a subdivision); *T.R. Mills*, 93 S.W.3d at 864−65 (involving a contract between a contractor and a corporation for the construction of a subdivision). In one case, there was no dispute regarding the parties' obligations to arbitrate, but only a question as to whether an attorney fee provision contained within the Rules of the American Arbitration Association was incorporated by reference into the parties' contract. *See Lasco*, 467 S.W.3d at 470. Additionally, there was no dispute that both parties were fully aware of the attorney's fee provision, as both parties had requested attorney's fees pursuant thereto. *Id.* at 474. Although the issues in *Denley* and *T.R. Mills* involved the enforceability of an arbitration provision that was only included in the parties' form construction contracts by reference to another document (referred to as the A201 document), there was no dispute in either case that the parties had an opportunity to read the A201 document but simply had not. *Denley*, 2007 WL 1153121, at *1; *T.R. Mills*, 93 S.W.3d at 864−65. Indeed, the Court in *T.R. Mills* noted that the party seeking to avoid the terms of the A201 document was an experienced contractor who had signed similar contracts in his business in the past. *T.R. Mills*, 93 S.W.3d at 864−65. In contrast, in this case, there is no evidence that Ms. Wofford had ever previously executed a contract with a funeral home or, more importantly, that she was ever given a copy of Part 3 of the Contract. Instead, Ms. Wofford had no opportunity to read or understand the terms of Part 3 of the Contract.

This Court recently considered a somewhat similar factual situation in *Capps v. Adams Wholesale Co.*, No. E2014-01882-COA-R3-CV, 2015 WL 2445970 (Tenn. Ct. App. May 21, 2015) (no perm. app. filed). In *Capps*, the disputed arbitration provision was contained within the limited warranty covering decking boards manufactured by the defendant. Each bundle of the product and each individual piece of decking board contained a notice referencing the limited warranty and providing the phone number and website where the terms of the limited warranty could be found. The limited warranty contained a broad arbitration provision. *Id.* at *1. The buyer of the products eventually sued the manufacturer for defects in the products and misrepresentation. *Id.* at *1−*2. The manufacturer filed a motion to dismiss or to stay the proceedings to compel arbitration. The trial court denied the motion to compel arbitration, finding that the buyers were unsophisticated and that it would be unconscionable to enforce the arbitration agreement against them.

---

[8] On appeal, Edwards devotes nearly four pages of its initial appellate brief to a discussion of Ms. Wofford's education and employment, nearly all of which was achieved by Ms. Wofford after signing the contract at issue. Even considering this evidence, the contract at issue represents an agreement between one relatively more sophisticated party and one relatively less sophisticated party, as discussed in detail, *infra*.

13

The Court of Appeals affirmed, concluding that there was no meeting of the minds as to the arbitration provision because of certain circumstances surrounding how the provision was presented to the buyer. According to the Court:

> We . . . agree that failure to read an agreement does not absolve a contracting party from the terms contained in an agreement. ***Giles v. Allstate Ins. Co***., 871 S.W.2d 154, 156 (Tenn. Ct. App. 1993). However, the "contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party." ***Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n***, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990) (citations omitted). In this case, [buyers] were not provided with a copy of the limited warranty that contained the arbitration agreement prior to their purchase or when the product was delivered for installation. The notices provided on the product did not reference an arbitration agreement or provide any indication that acceptance of the product was tantamount to acceptance of an arbitration agreement. [Buyers], like any ordinary consumer, did not consult their warranty to contact the manufacturer of the product until after they experienced an issue, approximately six months after the product was installed. Under these specific circumstances, we hold that an arbitration agreement was not formed because there was never an objective mutual assent to the terms of the agreement when [buyers] were not notified that such an agreement existed.

*Capps*, 2015 WL 2445970, at *3. Accordingly, the Court of Appeals affirmed the trial court's denial of the motion to compel arbitration.

The situation in *Capps* is, to a certain extent, analogous to the situation in the case-at-bar. Here, like the buyers in *Capps*, Ms. Wofford was not provided with the part of the Contract that Edwards now seeks to enforce against her. In *Capps*, the notice provided to the buyer did not specifically mention arbitration; in this case, however, there is no dispute that Part 2 of the Contract expressly mentions arbitration. We note, however, that at this juncture the issue is not whether arbitration should be enforced against Ms. Wofford, but whether Part 3 should be considered incorporated by reference into the parties' Contract. With regard to the incorporation question, of particular relevance is the fact that the buyers in *Capps* were provided with an avenue to obtain the portion of the contract that was never provided to them; Ms. Wofford was never afforded such an opportunity. Moreover, Edwards's failure to

14

provide Ms. Wofford with Part 3 of the Contract was not an oversight; Mr. Collins indicated in his deposition that Edwards chose not to provide this portion of the Contract to its customers during the period of time in which Ms. Wofford was a customer.

Under the circumstances of this case, we cannot conclude that Edwards has shown mutual assent to the terms contained in Part 3 of the Contract. This is not a situation where a party is provided with a contract but voluntarily fails to read and understand its terms. Simply put, Ms. Wofford cannot be said to have consented to terms of a contract that she was never given an opportunity to review. As previously discussed, "where mutual assent is lacking, no contract was ever formed." *Allstate*, 363 S.W.3d at 528 (citing *Higgins*, 811 S.W.2d at 879). Here, like in *Capps*, Ms. Wofford never had reason to question the missing document until a dispute arose as to its applicability. *See Capps*, 2015 WL 2445970, at *3 (noting that the buyer did not consult the warranty until after a dispute arose). In this particular circumstance, because Ms. Wofford was never provided with Part 3 of the Contract, it never became a part of the parties' agreement. Accordingly, we will only consider the enforceability of the arbitration clause contained in Part 2 of the Contract.

### Contract of Adhesion

Having determined what constitutes the parties' agreement with regard to arbitration, we must next consider whether the arbitration provision actually included in the Contract is enforceable. To support her argument that the arbitration provision is unenforceable, Ms. Wofford argues that the Contract at issue constitutes a contract of adhesion. The Tennessee Supreme Court outlined the appropriate analysis for determining a contract of adhesion in *Buraczynski v. Eyring*, 919 S.W.2d 314 (Tenn. 1996). According to the Tennessee Supreme Court:

> An adhesion contract has been defined as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." *Black's Law Dictionary* 40 (6th ed. 1990); *Broemmer* [*v. Abortion Services of Phoenix Ltd.*], 840 P.2d [1013,] 1015 [(1992)]. Professor Henderson has observed that "the essence of an adhesion contract is that bargaining positions and leverage enable one party 'to select and control risks assumed under the contract.'" [Stanley D. Henderson, *Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice*,] 58 Va.L.Rev. [947,] 988. Courts generally agree that "[t]he

15

distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms." ***Broemmer***, 840 P.2d at 1016 . . . .

***Buraczynski***, 919 S.W.2d at 320 (some citations omitted). In ***Buraczynski***, the Court concluded that the medical services arbitration contract at issue was a contract of adhesion because:

> The agreements are standardized form contracts prepared by the contracting party with superior knowledge of the subject matter—the rendition of medical services. The agreements, by [the physician's] own admission, were offered to the patients on a 'take it or leave it' basis. Had these patients refused to sign the agreements, [the physician] would not have continued rendering medical care to them. Although the patients could have refused to sign the arbitration agreements and sought out another physician in the area, that action would have terminated the physician-patient relationship (ordinarily one of trust) and interrupted the course of the patient's treatment. To make any choice would be difficult; but to choose not to sign would result in the loss of the desired service—medical treatment from [the physician].

***Buraczynski***, 919 S.W.2d at 320. Thus, the ***Buraczynski*** Court held that the contract was an adhesion contract because: (1) it was a standardized form contract; (2) the offering party had a superior knowledge of the underlying subject matter; (3) the contract was offered on a "take it or leave it" basis; (4) failing to sign the agreement would have interrupted the rendition of services; and (5) because of the type of services involved, choosing another provider would have caused delay, resulting in a difficult choice.

Having thoroughly reviewed the record on appeal, we conclude that the Contract at issue in this case, like in ***Buraczynski***, is a contract of adhesion. First, there is no dispute in this case that the contract signed by Ms. Wofford was a standardized form contract that was presented by Edwards. Indeed, Mr. Collins testified that the Contract was not prepared by Edwards but by a separate contract company from whom Edwards had purchased contract software. Edwards was familiar with the Contract as it had been using the contract since 2010. Moreover, Edwards's employees had a greater knowledge of the subject matter, the rendition of funeral services, than their customers, who Mr. Collins explained could be emotionally vulnerable during this time:

16

> [W]e deal with all types of families during the worst part of their life. Death is the worst part of a person's life. And so we actually have to walk them through a process. And because most people don't know the process, so we walk them through a process from beginning to end to carry their loved one to their final resting place.

Additionally, Mr. Collins testified that if an individual refused to sign the standard form contract at issue in this case, Edwards "would refuse services" to that individual.[9] Accordingly, the undisputed evidence shows that the standard form contract was offered to Ms. Wofford on a "take it or leave it basis."

Edwards argues, however, that cases decided in the wake of *Buraczynski* have indicated that in order to find that contract is one of adhesion, there must have been no reasonable alternatives in the market. For example in *Wallace v. National Bank of Commerce*, 938 S.W.2d 684 (Tenn. 1996), decided mere months after the decision in *Buraczynski*, the Tennessee Supreme Court concluded that a contract between a consumer and a bank was not a contract of adhesion because of the consumer's ability to obtain the desired services by other banks in the marketplace. *Id.* at 687–88. According to the Tennessee Supreme Court:

> [M]ost significantly, there is no showing in the record that the customers had no realistic choice but to acquiesce in the imposition of the banks' charges. There is no showing that the fees were the same at all the defendant banks or that banking services could not be obtained from other institutions. It is common knowledge that the banking industry is very competitive. For example, different banks may charge lower fees for some services and higher fees for other services, and they also may charge lower interest rates on loans but higher fees for services, thus providing choices which may appeal to various prospective customers. In the absence of a showing that there was no effective competition in the providing of services among the banks in the area served by the defendants, there is no basis for concluding that the appellants had no realistic choice regarding the terms for obtaining banking services.

*Id.*

---

[9] Mr. Collins testified, however, that he had never experienced such a situation.

17

In a more recent case, *Desgro v. Pack*, No. E2012-00918-COA-R3CV, 2013 WL 84899 (Tenn. Ct. App. Jan. 8, 2013), this Court considered a contract governing the inspection of a house. *Id.* at *1. The inspection revealed no serious problems, and the plaintiff purchased the house. After multiple serious problems were thereafter discovered, the plaintiff sued the defendant-inspector. The defendant filed a motion for summary judgment, arguing that the claim was barred by the contractual limitations period. The plaintiff argued that the limitations period should not be enforced because the contract was one of adhesion. *Id.* The Court of Appeals concluded that the contract was not one of adhesion because the contract was not offered on a "take it or leave it" basis. According to the Court:

> Plaintiff did not question the terms of the agreement, did not attempt to bargain with the defendant regarding the agreement, and there was no proof that defendant told plaintiff he had to sign the document to obtain the service. Plaintiff stated that he contacted defendant at the recommendation of his realtor, but plaintiff likely could have obtained the service from someone else because plaintiff did not show that defendant was the only home inspector in the area.

*Id.* at *3.

Edwards argues that this case is analogous to *Wallace* and *Desgro* in that Ms. Wofford failed to read, much less question, the terms of the agreement. In addition, Edwards asserts that Ms. Wofford has failed to show that she could not have obtained the desired services from another funeral home. To support this argument, Edwards points out the multiple funeral homes named as defendants in this case, none of which required their customers to sign arbitration agreements. Additionally, the record shows that Ms. Wofford was aware of other funeral homes where she could have obtained the desired services.

From our reading, however, the analysis in *Buraczynski* rests on one critical finding—that the relationship between doctor and patient is unique and built on trust. *See Buraczynski*, 919 S.W.2d at 319–320. Indeed, other Courts have come to similar conclusions. *See Skelton v. Freese Const. Co.*, No. M2012-01935-COA-R3CV, 2013 WL 6506937, at *8 (Tenn. Ct. App. Dec. 9, 2013) (noting that *Buraczynski* involved "the physician-patient trust relationship"); *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 360 (Tenn. Ct. App. 2001) (noting that deciding factor in *Buraczynski* was the "peculiar relationship between the parties"). Because of this unique relationship and the exigency in which the services may be needed, the *Buraczynski* Court found that it would be problematic for the patient to terminate the relationship and seek another medical professional to perform the desired services.

Based upon our reading of **Buraczynski**, we also conclude that Ms. Wofford, like the patient in **Buraczynski**, would have been faced with a difficult decision had she decided to terminate the relationship with Edwards. First, even Mr. Collins admitted that the procurement of funeral services is an emotional decision that is unfamiliar to most people. Indeed, the legislative history behind the federal regulations governing funeral services recognizes that "[a]rranging a funeral plainly involves emotional, religious, and other important social considerations" and, like in **Buraczynski**, is a "unique" situation. Trade Regulation Rule; Funeral Industry Practices, 47 FR 42260-01.

Moreover, because of the actions that had already taken place, Ms. Wofford had "no realistic choice but to acquiesce" in signing the Contract.[10] *See* **Wallace**, 938 S.W.2d at 687 (emphasis added); *see also Webster's New World College Dictionary* 1209 (5th ed. 2014) (defining "realistic" as "tending to face facts; practical"). Here, Ms. Wofford first spoke with employees of Edwards on June 11, 2013. It appears that many, if not all, of the funeral plans were finalized at this meeting. It is undisputed that at the time that Ms. Wofford was asked to sign the Contract sought to be enforced against her, Edwards had already taken possession of her father's body, moved forward with obtaining the life insurance proceeds to pay for the services, embalmed the body, ordered the casket, worked to obtain a death certificate, and endeavored to place Ms. Wofford's father's obituary in the newspaper. Accordingly, by the time that Ms. Wofford was actually presented with the Contract containing the arbitration provision, Edwards had already put the plan for the funeral services in motion. To ask Ms. Wofford to refuse to go forward with the funeral services with Edwards at this point is akin to asking her to "swap horses in midstream."[11] Thus, we conclude that, based upon the

---

[10] In Mr. Collins's deposition, he testified that it was "common" for funeral customers to change their minds about where they wanted the funeral services for their loved ones to take place. He later clarified that this situation presents in approximately 2.5 % of the times that his funeral home is contacted for services. We cannot agree that this represents a common occurrence.

[11] The proliferation of the proverb warning against "swapping horses in midstream" is typically attributed to President Abraham Lincoln in his 1864 presidential campaign. According to an article in the New York Tribune on June 10, 1864, President Lincoln stated in support of his reelection:

> I have not permitted myself, gentlemen, to conclude that I am the best man in the country; but I am reminded, in this connection, of a story of an old Dutch farmer, who remarked to a companion once that "it was not best to swap horses when crossing streams."

Wolfgang Meider, *"Proverbs Speak Louder Than Words": Folk Wisdom in Art, Culture, Folklore, History, Literature, and Mass Media* 208 (2008). Although President Lincoln is widely credited with authoring the proverb, scholars have noted its presence in the American lexicon prior to 1864. *See id.* at 210. After President Lincoln was reelected, the proverb gained popularity as a slogan for other politicians running for reelection. *Id.* at 219. The most notable of which was President Franklin Delano Roosevelt, who successfully utilized the

totality of the circumstances presented in this particular case, the Contract at issue is a contract of adhesion.[12]

## Unconscionability

Our conclusion that the contract is one of adhesion, however, is not dispositive of its enforceability. Instead, the party seeking to avoid the contract must also show that "the terms of the contract are beyond the reasonable expectations of an ordinary person, **or** oppressive **or** unconscionable." *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996) (emphasis added) (citing *Broemmer v. Abortion Servs. of Phoenix Ltd.*, 840 P.2d 1013, 1015 (1992)). "Despite the favored status of arbitration agreements, Tennessee courts have refused to enforce such agreements when they have been found to be unconscionable." *Trigg v. Little Six Corp.*, 457 S.W.3d 906, 912 (Tenn. Ct. App. 2014), *perm. app. denied* (Tenn. Nov. 20, 2014) (citing several cases discussed throughout this Opinion). Furthermore, "[c]ourts will not enforce adhesion contracts which are oppressive to the weaker party or which serve to limit the obligations and liability of the stronger party." *Buraczynski* 919 S.W.2d at 320 (*Broemmer*, 840 P.2d at 1015). Additionally, where it is contained in a contract of adhesion, an arbitration provision will not be enforced unless the party seeking to compel arbitration can show that it was "actually bargained over the arbitration provision or that it was a reasonable term considering the circumstances." *Howell v. NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731 (Tenn. Ct. App. 2003) (quoting *Brown v. Karemor International*, Inc., 1999 WL 221799, at *3 (Tenn. Ct. App. April 19, 1999) *perm. app. granted* (Tenn. Jan. 18, 2000), *perm. app. denied* (Tenn. June 30, 2000)).[13]

---

proverb as a slogan in his 1936, 1940, and 1944 reelection campaigns. *Id.* at 221.

[12] We recognize that a substantially similar contract was not found to be a contract of adhesion in *Service Corporation International v. Lopez*, 162 S.W.3d 801 (Tex. Ct. App. 2005). While cases from other jurisdictions are sometimes persuasive in this Court, they do not operate as controlling authority, and we are free to come to a contrary conclusion. *See* *Summers Hardware & Supply Co. v. Steele*, 794 S.W.2d 358, 362 (Tenn. Ct. App. 1990). Furthermore, the Texas Court of Appeals indicates that Texas applies a somewhat more exacting standard for determining whether a contract constitutes a contract of adhesion. *See Lopez*, 162 S.W.3d at 809 (defining an adhesion contract as one where a "party has **absolutely** no bargaining power or ability to change the contract terms") (emphasis added) (citing *In re H.E. Butt Grocery Co.*, 17 S.W.3d 360, 370–71 (Tex. Ct. App. 2000)).

[13] Although the language in *Howell* has never been specifically adopted by the Tennessee Supreme Court, our Supreme Court denied permission to appeal in *Howell* on June 30, 2003. Thus, the *Howell* language remains good law. In 2006, however, this Court limited the application of the *Howell* rule to only contracts of adhesion. *See Diagnostic Ctr. v. Steven B. Stubblefield*, M.D., P.C., 215 S.W.3d 843, 847 & n.2 (Tenn. Ct. App. 2006) (indicating that the *Howell* rule only applies to contracts of adhesion); *see also Broadnax v. Quince Nursing & Rehab. Ctr.*, *LLC*, No. W200802130COAR3CV, 2009 WL 2425959, at *7 (Tenn. Ct. App. Aug. 10, 2009) (same); *Estate of Mooring v. Kindred Nursing Centers*, No. W200702875COAR3CV,

20

Accordingly, we must next determine whether the arbitration clause is unconscionable and therefore unenforceable. As the Tennessee Supreme Court recently explained:

> If a contract or term thereof is unconscionable at the time the contract is made, a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term. *See Restatement (Second) of Contracts* § 208 (1981). "The determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose and effect. Relevant factors include weaknesses in the contracting process like those involved in more specific rules as to contractual capacity, fraud, and other invalidating causes . . . ." *Restatement (Second) of Contract*[*s*] § 208, cmt. a (1981).
>
> Enforcement of a contract is generally refused on grounds of unconscionability where the "inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Haun v. King*, 690 S.W.2d 869, 872 (Tenn. Ct. App. 1984) (quoting *In re Friedman*, 64 A.D.2d 70, 407 N.Y.S.2d 999 (1978)); *see also Aquascene, Inc. v. Noritsu Am. Corp.*, 831 F.Supp. 602 (M.D. Tenn.1993). An unconscionable contract is one in which the provisions are so one-sided, in view of all the facts and circumstances, that the contracting party is denied any opportunity for meaningful choice. *Id.*

*Berent v. CMH Homes, Inc.*, 466 S.W.3d 740, 746–47 (Tenn. 2015) (quoting *Taylor v. Butler*, 142 S.W.3d 277, 285 (Tenn. 2004)); *see also Owens v. Nat'l Health Corp.*, 263 S.W.3d 876, 889 (Tenn. 2007) ("A contract may be unconscionable if the provisions are so one-sided that the contracting party is denied an opportunity for a meaningful choice. . . . In making that determination, a court must consider all the facts and circumstances of a particular case.") (citations omitted).

---

2009 WL 130184, at *5 (Tenn. Ct. App. Jan. 20, 2009) (same). We note, however, that it is unclear how the first part of the *Howell* rule, that the parties actually bargained over the term, could ever apply to an adhesion contract, which by definition involves no bargaining between the parties. *See generally Buraczynski* 919 S.W.2d at 320 (discussed in detail, *infra*).

"The unconscionability analysis can be broken down into two component parts: (1) procedural unconscionability, which is an absence of the meaningful choice on the part of one of the parties and (2) substantive unconscionability, which refers to contract terms which are unreasonably favorable to the other party." ***Philpot v. Tenn. Health Mgmt., Inc.***, 279 S.W.3d 573, 579 (Tenn. Ct. App. 2007) (citing ***Elliott v. Elliott***, No. 87–276–II, 1988 WL 34094, at *4 (Tenn. Ct. App. April 13, 1988)). "For example, a contract may be found to be procedurally unconscionable if the contract is presented to a party on a take it or leave it basis and the party is not given the opportunity to understand the agreement." ***McGregor v. Christian Care Ctr. of Springfield, L.L.C.***, No. M2009-01008-COA-R3-CV, 2010 WL 1730131, at *5 (Tenn. Ct. App. Apr. 29, 2010). Tennessee courts, however, "have tended to lump the two together[.]" ***Trinity Indus., Inc. v. McKinnon Bridge Co.***, 77 S.W.3d 159, 171 (Tenn. Ct. App. 2001). "Where the parties possess equal bargaining power the courts are unlikely to find that their negotiations resulted in an unconscionable bargain, . . . and terms that are common in the industry are generally not unconscionable." ***Trinity Indus***, 77 S.W.3d at 171 (citing ***Posttape Associates v. Eastman Kodak Co.***, 450 F.Supp. 407 (E.D.Pa. 1978); ***D.O.V. Graphics, Inc. v. Eastman Kodak Co.***, 46 Ohio Misc. 37, 347 N.E.2d 561 (Common Pleas 1976)).

Because of the proliferation of arbitration agreements, there is no shortage of Tennessee caselaw concerning the alleged unconscionability of these agreements. For example, in 1996, the Tennessee Supreme Court in ***Buraczynski***, as discussed above, considered the unconscionability of an arbitration provision contained within an adhesion contract between a patient and a physician. *See **id.*** In reaching its decision, the Court considered several factual situations in which courts throughout the United States had refused to enforce arbitration agreements. For example, the ***Buraczynski*** Court cited one case in which enforcement was refused because the arbitration provision was contained within the underlying services agreement and gave the consumer no option to revoke the contract. ***Id.*** (citing ***Obstetrics & Gynecologists William G. Wixted, M.D., Patrick M. Flanagan, M.D., William F. Robinson, M.D. Ltd. v. Pepper***, 101 Nev. 105, 693 P.2d 1259, 1260 (Nev. 1985)). The Court cited another decision in which a court refused to enforce an arbitration provision where the contract gave a health care provider the unilateral right to reject an arbitrator's decision without cause and require the arbitration to be reheard before a panel of physicians. ***Buraczynski***, 919 S.W.2d at 320 (citing ***Beynon v. Garden Grove Med. Grp.***, 100 Cal.App.3d 698, 161 Cal.Rptr. 146, 150 (1980)). Based upon these cases, the Court explained:

> An overview of these cases demonstrates that, in general, courts
> are reluctant to enforce arbitration agreements between patients

22

and health care providers when the agreements are hidden within other types of contracts and do not afford the patients an opportunity to question the terms or purpose of the agreement. This is so particularly when the agreements require the patient to choose between forever waiving the right to a trial by jury or foregoing necessary medical treatment, and when the agreements give the health care provider an unequal advantage in the arbitration process itself.

*Buraczynski*, 919 S.W.2d at 321.

Following this caselaw, the **Buraczynski** Court held that the arbitration provision at issue was enforceable because none of its provisions were oppressive. *Id.* Specifically, the Court focused on the facts that: (1) the arbitration agreement was not buried in the underlying services contract; (2) the arbitration agreement contained an appropriate explanation; (3) the arbitration procedure was specified by the agreement and gave no unfair advantage to the physician;[14] (4) specific portions of the agreement were required to be separately initialed, making those provisions especially conspicuous; (5) patients could revoke the arbitration agreements within thirty days of its execution; and (6) the agreements did not alter the physician's duty to exercise reasonable care. *Id.* Thus, the Court determined that none of the above factors led to the conclusion that the arbitration agreement was oppressive or beyond the reasonable expectations of the parties. *Id.*

This Court was faced with a similar question in *Howell v. NHC Healthcare-Fort Sanders, Inc*., 109 S.W.3d 731 (Tenn. Ct. App. 2003), which involved an arbitration agreement signed by a nursing home resident's husband in conjunction with her admission to the nursing home. *Id.* at 732. The resident's estate brought suit against the nursing home, alleging abuse and neglect prior to the resident's death. The nursing home filed a motion to compel arbitration based upon an arbitration provision contained in the admission agreement. The trial court refused to enforce the arbitration provision.

The Court of Appeals affirmed, concluding that the arbitration provision was not reasonable. First, the Court noted that "the reasonableness of the provision could not be determined simply by looking at the agreement itself." *Id.* at 734 (citing *Brown v. Karemor Int'l, Inc.*, 1999 WL 221799, at *3 (Tenn. Ct. App. Apr. 19, 1999)). Second, the Court noted that the contract containing the arbitration provision was provided to the resident's husband

---

[14] In *Buraczynski*, both parties were bound by the decision of the arbitrator and any claim that the physician had to unpaid fees must also have been decided by arbitration when a medical malpractice claim was asserted. *Id.*

on a "take it or leave it" basis and the resident's husband had no real bargaining power, given his "educational limitations." *Howell*, 109 S.W.3d at 735. The Court also focused on the fact that while a nursing home employee explained much of the agreement to the resident's husband, the fact that signing the contract would result in the waiver of the resident's right to a jury trial was not explained or even mentioned. Additionally, the Court noted that the arbitration provision was buried within an 11-page admission contract, rather than in a stand-alone contract, as in *Buraczynski*. Finally, the Court considered the fact that the arbitration provision did "not adequately explain how the arbitration procedure would work, except as who would administer it." *Howell*, 109 S.W.3d at 734. Based upon this constellation of facts, the Court of Appeals concluded that the arbitration provision was unenforceable because the nursing home "has not demonstrated that the parties bargained over the arbitration terms, or that it was within the reasonable expectations of an ordinary person." *Id.* at 735.

Recently, the Tennessee Supreme Court also considered the alleged unconscionability of an arbitration agreement contained in an adhesion contract for the purchase of a manufactured home. *See Berent v. CMH Homes, Inc.*, 466 S.W.3d 740, 743–44 (Tenn. 2015). In *Berent*, the plaintiff-purchaser sued the defendant-manufacturers for breach of contract. The defendants filed a motion to compel arbitration, which the plaintiff resisted on the ground that the arbitration provision was unconscionable due to non-mutuality of remedies. Specifically, the arbitration provision required that both parties submit all disputes other than small claims to arbitration. However, the contract provided that the manufacturers could seek relief in a judicial forum "to enforce their security interest" in the manufactured home or "to seek preliminary relief." *Id.* at 756.

The *Berent* Court concluded, however, that the arbitration provision at issue was not unconscionable. First, the Court held that non-mutuality of remedies, in isolation, did not *per se* invalidate an arbitration provision. *Id.* at 751. Instead, the Tennessee Supreme Court held that courts must "appl[y] the doctrine of unconscionability in a nuanced manner, weighing the degree of one-sidedness in the arbitration provision as an important factor, but not the only factor, and viewing the arbitration provision in the context of the overall contract and the surrounding circumstances." *Id.* Applying this framework, the *Berent* Court concluded that the circumstances surrounding the contract-at-bar did not lead to the conclusion that the arbitration provision was unconscionable or unenforceable. To reach this conclusion, the *Berent* Court distinguished the contract at issue from a previous contract that had been held invalid due to, *inter alia*, non-mutuality of remedies. *See id.* (citing *Taylor v. Butler*, 142 S.W.3d 277, 286–87 (Tenn. 2004)). Unlike the *Taylor* contract, which was, without justification, "completely one-sided", the provision allowing the manufacturers to institute judicial foreclosure proceedings was reasonable and necessary to preserve their security interest, as the arbitrator was not able to grant such relief. *Berent*, 466 S.W.3d at 756–57. As

24

explained by the Court:

> Viewing the Arbitration Agreement in the context of the overall circumstances, we must conclude that it is not unconscionable. While the Arbitration Agreement is contained in an adhesion contract and has some degree of non-mutuality in the parties' choice of forum, it is not nearly as "one-sided" as the arbitration agreement in *Taylor*. Moreover, the Sellers articulate a reasonable business justification for the carve-out for foreclosure proceedings on the manufactured home. Under these circumstances, the Arbitration Agreement is not unreasonably favorable to the Sellers or "beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable." *Taylor*, 142 S.W.3d at 286.

*Berent*, 466 S.W.3d at 758.

Many courts in recent years have likewise upheld the enforceability of arbitration agreements, finding that they were not oppressive, unreasonable, or beyond the expectations of ordinary persons. *See, e.g.,* ***Trinity Indus., Inc. v. McKinnon Bridge Co.***, 77 S.W.3d 159, 171 (Tenn. Ct. App. 2001) (concluding that a contract was not unconscionable where there was no unequal bargaining power between the parties and the terms were common in the industry); ***Trigg v. Little Six Corp.***, 457 S.W.3d 906, 916 (Tenn. Ct. App. 2014), *perm. app. denied* (Tenn. Nov. 20, 2014) (discerning no unconscionability where the plaintiff failed to meet his burden of showing that the costs of arbitration would be prohibitive); ***Reagan v. Kindred Healthcare Operating, Inc.***, No. M2006-02191-COA-R3-CV, 2007 WL 4523092, at *15 (Tenn. Ct. App. Dec. 20, 2007), *perm. app. denied* (Tenn. Feb. 17, 2009) (enforcing an arbitration agreement after finding that the contract was not one of adhesion, that the arbitration agreement was in a stand-alone contract, that the contract explained that arbitration resulted in a waiver of jury and appeal rights, and the contract did not change the duties or liabilities of the parties); ***Philpot v. Tenn. Health Mgmt., Inc.***, 279 S.W.3d 573, 581–82 (Tenn. Ct. App. 2007) (enforcing an arbitration agreement where the contract was signed under no real urgency, the plaintiff was aware of other options to acquire the desired service, the arbitration provision and its terms were clear and prominently disclosed in the contract in several places, and the requirement to arbitrate applied to both parties equally). Other courts have, however, invalidated arbitration contracts where they were unreasonable or oppressive to the weaker party. *See, e.g.,* ***Taylor***, 142 S.W.3d at 286 (holding unconscionable and unenforceable an arbitration provision that allowed the dealer who drafted the agreement to retain judicial remedies beyond arbitration while limiting the customer's remedies to those available under the TUAA, without any justification for the

25

complete non-mutuality of remedies); *Hill v. NHC Healthcare/Nashville, LLC*, No. M2005-01818-COA-R3-CV, 2008 WL 1901198, at *12 (Tenn. Ct. App. Apr. 30, 2008) (holding that an arbitration was unenforceable due to the contract's lack of clarity regarding the arbitration procedure and due to the fact that the party seeking arbitration must front the costs of arbitration, which would deter the pursuit of claims by a consumer); *McGregor v. Christian Care Ctr. of Springfield, L.L.C.*, No. M2009-01008-COA-R3-CV, 2010 WL 1730131, at *7 (Tenn. Ct. App. Apr. 29, 2010) (concluding that an arbitration agreement was unconscionable because it "limits the obligations of the stronger party"); *Brown v. Tenn. Title Loans Inc.*, 216 S.W.3d 780, 787 (Tenn. Ct. App. 2006) (invalidating an arbitration clause on the basis of the complete non-mutuality of remedies); *Raiteri ex rel Cox v. NHC Healthcare/Knoxville, Inc.*, No. E2003-00068-COA-R9-CV, 2003 WL 23094413, at *8 (Tenn. Ct. App. Dec. 30, 2003) (concluding that an arbitration provision was unenforceable where the arbitration provision was contained in an eleven-page services contract, the underlying contract was one of adhesion, "essential terms in the mediation and arbitration provisions are 'buried' and not clearly 'laid out,'" and the arbitration provision was not conspicuous).

Turning to the facts in this case, we must conclude that to enforce the arbitration provision would be unreasonable under the circumstances. *Howell*, 109 S.W.3d at 734. Again, we note that the only reference to arbitration properly included in the parties' agreed-upon Contract states nothing more than:

> BY SIGNING THIS AGREEMENT, YOU ARE AGREEING THAT ANY CLAIM YOU MAY HAVE AGAINST THE SELLER SHALL BE RESOLVED BY ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A COURT OR JURY TRIAL, AS WELL AS YOUR RIGHT OF APPEAL.

Several factors weigh in favor of concluding that the Contract is not unconscionable, unreasonable, or oppressive. First, unlike in *Howell* and other cases, we note that while the arbitration agreement is not included in a separate contract, *see Reagan*, 2007 WL 4523092, at *15, the above clause is not hidden within a several-pages-long contract, but is included in capitalized, bold-faced font, immediately prior to the signature section of the two-page services contact. *See Raiteri*, 2003 WL 23094413, at *8 (relying, in part, on the fact that the arbitration provision was buried in an eleven-page contract and was not conspicuous to invalidate an arbitration agreement); *Howell*, 109 S.W.3d at 734 (invalidating an arbitration clause, in part, on the fact that the clause was hidden in a long contract and was not conspicuous). In addition, the clause clearly indicates that by agreeing to arbitration, Ms. Wofford is waiving her right to a jury trial. *See Reagan*, 2007 WL 4523092, at *15 (enforcing an arbitration agreement, in part, based on the fact that the agreement clearly indicated that agreeing would result in a waiver of the contracting party's right to a trial by

jury); **Howell**, 109 S.W.3d at 735 (noting one factor in declining to enforce the arbitration agreement was the fact that the waiver of the right to a jury was never explained). Further, nothing in the record suggests that Ms. Wofford was not provided with an opportunity to question the terms of the agreement; instead, it is undisputed that she simply signed the agreement after ensuring that the price was correct. *See* **Buraczynski**, 919 S.W.2d at 321 (indicating that contracts generally should not be enforced where the weaker party has no opportunity to question the terms of the agreement). Finally, although changing funeral homes would have been a difficult decision, as discussed *supra*, Ms. Wofford was aware of other funeral homes that she could have utilized other than Edwards. *See* **Philpot**, 279 S.W.3d at 581−82 (considering the fact that the plaintiff knew of other purveyors who could perform the desired service in declining to invalidate the arbitration agreement).

Some factors are less clear. For example, we note that the arbitration agreement contained within the parties' agreement offers little notice as to the procedure and effect of arbitration. *See* **McGregor**, 2010 WL 1730131, at *5 (holding that to determine unconscionability, the court should consider whether the plaintiff was given an opportunity to understand the effect of the agreement); **Hill**, 2008 WL 1901198, at *12 (invalidating the arbitration agreement, in part, on the lack of clarity regarding the arbitration procedure). Nothing in the Contract indicates the procedure for seeking arbitration, how an arbitrator will be appointed, the binding effect of arbitration, or any of the procedure to be utilized during the arbitration proceedings.

Edwards argues, however, that these omissions are corrected by application of the TUAA. Specifically, Tennessee Code Annotated Section 29-5-304 provides that in the absence of a contractual method of appointing an arbitrator, the court "shall appoint one (1) or more arbitrators" on application of the parties. In addition, Tennessee Code Annotated Section 29-5-305 provides that unless agreed upon otherwise "the powers of the arbitrators may be exercised by a majority." Other sections outline the procedure to be used in the arbitration proceedings. *See generally* Tenn. Code Ann. § 29-5-306 (governing the proceedings before the arbitrator); Tenn. Code Ann. § 29-5-307 (ensuring that the parties may be represented by counsel throughout the arbitration proceedings); Tenn. Code Ann. § 313 (governing the standard for vacating an award). From our review, these statutes have never been utilized to flesh out a meager arbitration clause like the one at issue in this case;[15]

_____

[15] A similar issue was presented in **Diggs v. Lingo**, No. W2014-00525-COA-R3-CV, 2014 WL 7431466 (Tenn. Ct. App. Dec. 30, 2014). In **Diggs**, the trial court refused to enforce an arbitration agreement, finding:

> [The contract] contains ambiguities relating to how an arbitration is to proceed when there are, as here, multiple parties. While T.C.A. § 29-5-304 does provide some guidance to a court, it does not address the questions

instead, courts have only utilized these statutes to replace specific terms expressly included in arbitration agreements, where those terms are made impossible by changed circumstances. *See Owens v. Nat'l Health Corp.*, 263 S.W.3d 876, 886 (Tenn. 2007) (holding that where the term of the contract appointing a specific arbitrator fails, "the court may appoint one or more arbitrators to conduct the arbitration"); *Hill*, 2008 WL 1901198, at *4 (following the holding in *Owens*). However, the statutory provisions clearly apply both when a term fails and in the absence of any term chosen by the parties. *See* Tenn. Code Ann. §29-5-304, -305. Thus, we must conclude that the failure to include these terms is not *per se* fatal to the enforceability of the arbitration clause. We note, however, that Edwards's failure to include any of the material terms regarding the arbitration proceedings did result in a lack of clarity regarding the process. In our view, a lack of clarity regarding the proceedings would impact an ordinary person's expectations under the Contract. We will, therefore, consider the lack of clarity regarding the arbitration process provided by the Contract's terms in our overall determination regarding the reasonable expectations of an ordinary person given the circumstances when she signed the Contract. *See Hill*, 2008 WL 1901198, at *12.

In addition to the lack of specific terms in the arbitration clause, other factors tend to show that the contract is oppressive or unreasonable. First, we note that unlike in some other cases, Ms. Wofford was required to sign the Contract at issue in an expedient manner, given the nature of the services required. *See Philpot*, 2007 WL 4340874 at *6 (noting that one factor against a determination of unconscionability was that the only urgency in signing the contract was the plaintiff's desire to conclude the business during his lunch break). Next, as previously determined, the Contract was offered to Ms. Wofford on a "take it or leave it" basis. *See McGregor*, 2010 WL 1730131, at *5 (considering the fact that the contract was offered on a "take it or leave it" basis in determining unconscionability). In addition, because of Ms. Wofford's relative lack of knowledge of the funeral services industry, there was comparatively unequal bargaining power between the parties. *See Trinity Indus*, 77 S.W.3d at 171 (considering the fact that both parties were sophisticated businesses possessing equal bargaining power in declining to hold that the arbitration provision was unconscionable). The arbitration provision also provides Ms. Wofford with no method to revoke the agreement after signing. *See Buraczynski*, 919 S.W.2d at 320–21 (considering the revocability of the

---

> presented here concerning the number of arbitrators, how the arbitrators are to be chosen and what represents an agreement or the lack of an agreement among the arbitrators. These ambiguities and others lead the Court to conclude that the arbitration clause is so unclear as to render that clause unenforceable. It is not appropriate for the Court to essentially create a workable arbitration procedure when the settlor failed to do so himself.

*Diggs*, 2014 WL 7431466, at *3. The Court of Appeals, however, relied upon other grounds to invalidate the arbitration agreement and did not consider this issue. *Id.* at *4.

arbitration agreement as a factor in its enforceability). Additionally, it does not appear that an arbitration requirement is particularly common in the funeral services industry of Memphis, Tennessee, as none of the other defendant-funeral homes included one in their contracts. *See id*. (considering whether the terms alleged to be unconscionable were common in the industry in determining the unconscionability of an arbitration agreement). Moreover, the arbitration provision actually included in the parties' Contract is completely one-sided in that it expressly requires that only Ms. Wofford is required to submit her claims to arbitration. *Berent*, 466 S.W.3d at 758; *Taylor*, 142 S.W.3d at 286.

Given the totality of the circumstances, we must conclude that the arbitration provision at issue is unconscionable and unenforceable. Here, the arbitration provision is completely one-sided and offers little clarification regarding the binding effect of arbitration. To hold Ms. Wofford to binding arbitration in light of the meager arbitration clause included in the contract would be beyond the reasonable expectations of an ordinary person.[16] Accordingly, we, like the trial court, decline to enforce the arbitration provision contained in the Contract.

## Estoppel

Edwards next argues that the Contract should nevertheless be enforced on the basis of estoppel because Ms. Wofford is suing for breach of contract. To support this argument, Edwards cites *Wilson v. Wilson*, 23 Tenn. App. 244, 130 S.W.2d 140, 145 (Tenn. 1939), which states that: "The rule is well settled that a party cannot claim benefits under an instrument without at the same time becoming bound by all of its provisions." Edwards cites no cases, however, where an unconscionable term in an agreement was nevertheless enforced because a party raised a claim for breach of contract. Furthermore, the Tennessee Supreme Court has held that because arbitration provisions relate only to remedy, they are collateral to

---

[16] We note that other courts have come to differing conclusions on this issue. *See Serv. Corp. Int'l v. Lopez*, 162 S.W.3d 801, 807 (Tex. Ct. App. 2005) *Serv. Corp. Int'l v. Fulmer*, 883 So. 2d 621, 630 (Ala. 2003). As previously discussed, however, decisions from outside Tennessee are not controlling on this Court. *See Summers Hardware & Supply Co. v. Steele*, 794 S.W.2d 358, 362 (Tenn. Ct. App. 1990). Furthermore, neither *Lopez* nor *Fulmer* involved the specific issues raised in this case. We concede that both cases involved a contract prepared by the same national software company that prepared the Contract at issue in this case; the contracts are largely identical. In those cases, the plaintiff, like in this case, sought to avoid arbitration by arguing that the arbitration provisions were unconscionable. *Lopez*, 162 S.W.3d at 809–10; *Fulmer*, 883 So. 2d at 631–32. Both courts found no unconscionability sufficient to invalidate the arbitration agreements. *Lopez*, 162 S.W.3d at 810; *Fulmer*, 883 So. 2d at 632. In neither case, however, was there an allegation that the plaintiff had been denied a copy of Part 3 of the contract. *See generally Lopez*, 162 S.W.3d at 809–10; *Fulmer*, 883 So. 2d at 631–32. Accordingly, unlike in this case, the *Lopez* and *Fulmer* courts were able to consider the specific terms contained in Part 3 of the contract.

the underlying agreement and "severable from the main body of the contract." ***Taylor v. Butler***, 142 S.W.3d 277, 287 (Tenn. 2004). Finally, after a thorough review of the record, it appears that Edwards did not raise this argument in the trial court. *See **Welch v. Bd. of Prof'l Responsibility for the Supreme Court of Tenn.***, 193 S.W.3d 457, 465 (Tenn. 2006). Accordingly, we decline to apply the doctrine of estoppel in this case.

## Conclusion

Based upon the foregoing, the judgment of the Shelby County Chancery Court is affirmed, and this cause is remanded to the trial court for further proceedings. Costs of this appeal are taxed to Appellant, M.J. Edwards & Sons Funeral Home, Inc., and its surety.

_____
J. STEVEN STAFFORD, JUDGE