IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
May 31, 2018 Session Heard at Nashville[1]

**FREDERICK COPELAND v. HEALTHSOUTH/METHODIST
REHABILITATION HOSPITAL, LP ET AL.**

**Appeal by Permission from the Court of Appeals
Circuit Court for Shelby County
No. CT-000196-16     Rhynette N. Hurd, Judge**

—————————————————————

**No. W2016-02499-SC-R11-CV**

—————————————————————

A rehabilitation hospital hired a medical transportation company to take a patient to a doctor's appointment. Before the transport, the company's driver required the patient to sign an agreement that, in part, released the company from any liability. After the appointment, the patient fell as he was getting into the company's van. He sued the medical transportation company, which moved to dismiss based on the exculpatory provisions of the agreement. The trial court and the Court of Appeals ruled that the exculpatory provisions were enforceable. We hold that to determine the enforceability of an exculpatory agreement, a court should consider the totality of the circumstances and weigh these non-exclusive factors: (1) relative bargaining power of the parties; (2) clarity of the exculpatory language, which should be clear, unambiguous, and unmistakable about what the party who signs the agreement is giving up; and (3) public policy and public interest implications. We hold that the exculpatory provisions in the agreement between the medical transportation company and the patient are unenforceable based on the unequal bargaining power of the parties, the overly broad and unclear language of the agreement, and the important public interest implicated by the agreement. Thus, the exculpatory language in the agreement does not, as a matter of law, bar the patient's claim. We vacate the judgment of the trial court, reverse the judgment of the Court of Appeals, and remand this case to the trial court for further proceedings.

---

[1] We heard oral argument on the campus of Lipscomb University in Nashville, Davidson County, Tennessee, as part of the American Legion Auxiliary Volunteer Girls State S.C.A.L.E.S (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Judgment of the Trial Court Vacated; Remanded to the Trial Court**

SHARON G. LEE, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Donald K. Vowell, Knoxville, Tennessee, and David E. Gordon and Erin L. Hillyard, Memphis, Tennessee, for the appellant, Frederick Copeland.

Diana M. Comes, Memphis, Tennessee, for the appellee, MedicOne Medical Response Delta Region, Inc.

**OPINION**

**I.**

Frederick Copeland was a patient at HealthSouth Rehabilitation Hospital North Memphis (HealthSouth or the hospital) after having knee replacement surgery. On December 2, 2014, Mr. Copeland had an appointment to see his orthopedic surgeon. The hospital had contracted with MedicOne Medical Response Delta Region, Inc. (MedicOne), a medical transportation company, to provide transportation services for its patients, including Mr. Copeland.

On the day of Mr. Copeland's appointment at his orthopedic surgeon's office, a MedicOne employee driving a wheelchair van[2] arrived at the hospital to take Mr. Copeland to and from the appointment. After the driver pushed Mr. Copeland in a wheelchair from his room to the entrance of the hospital, Mr. Copeland got out of the wheelchair, walked to the van using a walker, and climbed into the front passenger seat. Before leaving HealthSouth, the MedicOne driver gave Mr. Copeland a pre-printed two-sided document that contained on one side a Wheelchair Van/Transportation Run Report (Run Report) and on the other side a Wheelchair Van Transportation Agreement (Agreement). The Run Report provided that HealthSouth was responsible for MedicOne's charges. The Agreement consisted of nine single-spaced paragraphs, including three paragraphs

---

[2] The MedicOne wheelchair van had no seats in the rear compartment, but was equipped with a mechanical wheelchair lift and safety restraints to secure the wheelchair and its occupant after being loaded into the van. The only seats in the van were the driver's seat and the front passenger seat.

of exculpatory language. The exculpatory language provided that Mr. Copeland was releasing MedicOne from any and all claims arising from or in any way associated with any transportation services provided by MedicOne. After Mr. Copeland signed the Run Report and the Agreement, the MedicOne driver took him to his doctor's appointment.

After the appointment, the MedicOne driver returned to the doctor's office to take Mr. Copeland back to the hospital. As Mr. Copeland was getting into the van, he lost his footing on the running board, fell, and was injured.

Mr. Copeland sued MedicOne for negligence in the Shelby County Circuit Court.[3] MedicOne moved to dismiss or, in the alternative, for summary judgment based on the exculpatory language in the Agreement. The trial court granted summary judgment in favor of MedicOne.[4] The trial court found that the Agreement was not a contract of adhesion and that the services provided by MedicOne were not professional services, but merely transportation services, and so, the exculpatory provisions were enforceable. The Court of Appeals affirmed, finding that the case involved non-professional transportation services and presented no significant public interest considerations. *Copeland v. HealthSouth/Methodist Rehab. Hosp., LP*, No. W2016-02499-COA-R3-CV, 2017 WL 3433130, at *3, *5 (Tenn. Ct. App. Aug. 10, 2017).

## II.

The issue here is the validity of the exculpatory language in the Agreement signed by Mr. Copeland releasing MedicOne from any liability. We review the trial court's summary judgment ruling on this question of law de novo with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)); *Circle C Constr., LLC v. Nilsen*, 484 S.W.3d 914, 917 (Tenn. 2016) (citing

---

[3] Mr. Copeland also sued HealthSouth, which is not a party to this appeal.

[4] MedicOne supported its motion with an affidavit of its records custodian and copies of the Run Report and the Agreement. The parties also relied on excerpts of the MedicOne driver's deposition testimony. The trial court treated the motion as a motion for summary judgment. Under Tennessee Rule of Civil Procedure 12.02, if a motion to dismiss based on 12.02(6) is supported by matters outside the pleading and those matters are not excluded by the court, the court treats the motion as one for summary judgment.

*Hamblen Cnty. v. City of Morristown*, 656 S.W.2d 331, 335–36 (Tenn. 1983)) (stating that contract interpretation is a question of law).

There is a natural tension between Tennessee's public policy that favors allowing parties to have freedom to contract[5] and the public policy that disfavors allowing a party to escape the consequences of the party's negligence. In *Olson v. Molzen*, 558 S.W.2d 429 (Tenn. 1977), we adopted factors to be considered when determining the enforceability of an exculpatory agreement. *Olson* involved an agreement, signed by a patient before a medical procedure, releasing the doctor from "any present or future legal responsibility associated with" the procedure. *Id.* at 429–30. The procedure was unsuccessful, and the patient sued the doctor. The trial court dismissed the lawsuit based on the agreement. *Id.* at 429. The Court of Appeals affirmed the dismissal. *Id.*

On review, we acknowledged that parties may agree that one party will not be liable for negligence to the other party, subject to certain exceptions. *Id.* at 430 (citing *Moss v. Fortune*, 340 S.W.2d 902 (Tenn. 1960)). This Court recognized a line of Tennessee cases upholding such agreements,[6] but none involving a physician, who is a "professional person operating in an area of public interest and pursuing a profession subject to licensure by the state." *Id.* at 430. We distinguished between "tradesmen in the market place" and those "experts" who were practicing state regulated professions. *Id.* This Court noted that because certain relationships require of one party "'*greater responsibility than that required of the ordinary person*,'" an exculpatory agreement between such parties is "'peculiarly obnoxious.'" *Id.* (quoting *Williston on Contracts* § 1751 (3d ed. 1972)). To guide the analysis, this Court adopted a series of factors from *Tunkl v. Regents of University of California*, 383 P.2d 441 (Cal. 1963), to be considered in determining whether a transaction affected the public interest:

> a. It concerns a business of a type generally thought suitable for public regulation.

---

[5] *Adams v. Roark*, 686 S.W.2d 73, 75 (Tenn. 1985); *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d, 188, 190 (Tenn. 1973); *Trailmobile, Inc. v. Chazen*, 370 S.W.2d 840, 844 (Tenn. Ct. App. 1963); *Moss v. Fortune*, 340 S.W.2d 902, 903–04 (Tenn. 1960).

[6] These prior cases included *Empress*, 503 S.W.2d 188; *Trailmobile*, 370 S.W.2d 840; and *Dixon v. Manier*, 545 S.W.2d 948 (Tenn. Ct. App. 1976).

b. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.

c. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.

d. As a result of the essential nature of the services, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.

e. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional fees and obtain protection against negligence.

f. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Olson*, 558 S.W.2d at 431. Noting that not all of these factors must be present for the exception to apply, we found that all the factors were present in *Olson* and held that the exculpatory agreement was unenforceable. *Id.* at 431–32.

After our decision in *Olson*, there was some confusion about whether the *Olson* factors applied only to exculpatory agreements involving professional services. In two cases, the Court of Appeals determined that the *Olson* analysis did not apply because the cases did not involve contracts for professional services. In *Schratter v. Development Enterprises, Inc.*, 584 S.W.2d 459, 461 (Tenn. Ct. App. 1979), the Court of Appeals upheld an exculpatory provision in a residential lease, based in part on its determination that this Court had limited application of the *Olson* factors to professional service contracts.[7] Likewise, in *Parton v. Mark Pirtle Oldsmobile-Cadillac-Isuzu, Inc.*, 730 S.W.2d 634, 636 (Tenn. Ct. App. 1987) (citing *Olson*, 558 S.W.2d at 430), the Court of Appeals declined to apply the

_____

[7] This Court later expressly overruled *Schratter* in *Crawford v. Buckner*, 839 S.W.2d 754, 760 (Tenn. 1992).

*Olson* factors to a contract for automobile repair because it concluded that this Court did not intend for the *Olson* analysis to apply to tradesmen in the market place.[8] By the same token, in *Petty v. Privette*, 818 S.W.2d 743 (Tenn. Ct. App. 1989), the Court of Appeals applied the *Olson* factors to exculpatory language in a will that was intended to protect the attorney who had drafted the will. Finding only two of the *Olson* factors were present, the Court of Appeals held that this was insufficient to render the exculpatory clause in the will unenforceable as against public policy. *Id*. at 746.[9]

Yet the Court of Appeals in other cases applied the *Olson* factors when ruling on the enforceability of exculpatory provisions in contracts not involving professional services. In *Childress v. Madison County*, 777 S.W.2d 1 (Tenn. Ct. App. 1989), the Court of Appeals analyzed an exculpatory release for participation in the Special Olympics. The intermediate appellate court held that the release did not fall under the exception provided by *Olson* based on the lack of any business motivations, citing the references in *Olson* to "'business, bargaining strength in economic settings, purchasers, and payment of additional fees, to obtain protection against negligence'" and concluded that "the rule was intended to operate primarily in the marketplace." *Id.* at 4 (quoting *Olson*, 558 S.W.2d at 431). The Court of Appeals in *Smith v. Peoples Bank of Elk Valley*, No. 01A01-9111-CV-00421, 1992 WL 117061, at *5 (Tenn. Ct. App. June 3, 1992), analyzed an exculpatory provision in a safe deposit box rental contract using the *Olson* factors. The intermediate appellate court held that the exculpatory provision was unenforceable because all factors were present – safe deposit box rental was regulated by statute and involved a service of great importance to the public; banks hold themselves out as willing to perform this service for any member of the public able to pay the rental fees; banks have greater bargaining power because most people cannot provide that type of protection for their valuables; it was a standardized contract of adhesion not open to negotiation; and the customer's property was placed under the control of the bank. *Id.* at *4.

---

[8] The *Parton* court held the agreement unenforceable on other grounds, finding that the exculpatory language hidden in fine print did not fall within the parties' "circle of assent" and thus did not relieve the defendant from liability. 730 S.W.2d at 638.

[9] Although the Court of Appeals did not find the exculpatory clause unenforceable under *Olson*, it remanded the case so the trial court could determine whether the clause was included because of undue influence, overreaching, or abuse of fiduciary relationship on the part of the attorney who drafted the will. 818 S.W.2d at 746–48.

In still other post-*Olson* cases, the Court of Appeals did not mention the *Olson* factors or any professional services requirement but relied on the language of the contract to determine the enforceability of the exculpatory provisions. In *Hays v. Ernesto's, Inc.*, 1987 WL 11119, at *2 (Tenn. Ct. App. May 19, 1987), the Court of Appeals found that exculpatory language in a release signed by a party before riding a mechanical bull was enforceable because parties may contract for a release from liability and an assumption of the risk incident to negligence. Similarly, in *Buckner v. Varner*, 793 S.W.2d 939, 941 (Tenn. Ct. App. 1990), the Court of Appeals upheld a waiver of liability signed by the plaintiff before participating in horseback riding.

After *Olson*, this Court upheld contractual provisions limiting liability to a sum certain. In *Affiliated Professional Services v. South Central Bell Telephone Co.*, 606 S.W.2d 671, 672 (Tenn. 1980), the Court declined to apply the *Olson* analysis to a provision in a contract with a telephone company that limited the company's liability for errors or omissions in yellow pages advertisements to the cost of the advertisement. Citing *Smith v. Southern Bell Telephone & Telegraph Co.*, 364 S.W.2d 952 (Tenn. 1962) and noting that nearly every appellate court that had considered this frequently litigated issue had upheld the limitation of liability in these contracts with telephone companies, the Court found that the case did not fall within the purview of *Olson* and upheld the agreement. *Affiliated Prof'l Servs.*, 606 S.W.2d at 672. Later, in *Houghland v. Security Alarms & Services, Inc.*, 755 S.W.2d 769, 773 (Tenn. 1988), this Court upheld a clause limiting the liability of a company providing security alarm monitoring to a sum certain, citing cases from other jurisdictions and noting that such limitations of liability have generally been upheld in these types of cases against providers of alarm monitoring services. The Court in *Houghland* mentioned *Olson*, observing that agreements such as the one examined there would be unenforceable if licensed professional personnel were involved. *Id.* (citing *Olson*, 558 S.W.2d 429). *Houghland* and its progeny involved limitations of liability and liquidated damages provisions, and thus were distinguishable from the agreement in *Olson*. In addition, the alarm monitoring company in *Houghland* did not present the contract on a "take-it-or-leave-it" basis, but offered the customer the opportunity to pay more for the services in return for the company assuming greater liability. *Id.*; *see also Underwood v. Nat'l Alarm Servs., Inc.*, No. E2006-00107-COA-R3-CV, 2007 WL 1412040 (Tenn. Ct. App. May 14, 2007); *E.B. Harvey & Co., Inc. v. Protective Sys., Inc.*, 1989 WL 9546 (Tenn. Ct. App. 1989).

In another post-*Olson* case, *Adams v. Roark*, 686 S.W.2d 73, 75 (Tenn. 1985), this Court did not reference the *Olson* factors in finding that a release signed by a participant in a motorcycle race was enforceable in a claim for ordinary negligence.[10] Instead, the Court noted that the public policy of Tennessee favors freedom to contract and that releases from liability in motor racing events are expressly permitted by statute in Tennessee.[11] *Id.* at 75–76.

This Court next considered the applicability of the *Olson* factors to a nonprofessional services contract in *Crawford v. Buckner*, 839 S.W.2d 754 (Tenn. 1992). Analyzing an exculpatory clause in a residential lease contract, the Court found that the landlord-tenant relationship satisfied all of the *Olson* factors, and thus the exculpatory clause in the lease was unenforceable because it was contrary to public policy. *Id.* at 758–59. The Court explained "where there is no declaration in the Constitution or the statutes, and the area is governed by common law doctrines, it is the province of the courts to consider the public policy of the state as reflected in old, court-made rules." *Id.* at 759. Thus, "the exception to the freedom of contract rule for exculpatory [provisions] affecting the public interest is also a judicial declaration of public policy." *Id.*

The Court in *Crawford* expressly overruled *Schratter* and other prior inconsistent decisions, noting *Schratter's* conclusion that the *Olson* factors applied only to contracts involving professional services. *Id.* at 760. The Court held that "under the facts here," the exculpatory clause in the lease was against public policy. *Id.* This limiting language appears to have added to the confusion about the applicability of the *Olson* factors because even after *Crawford*, the inconsistency in application continued.

In some post-*Crawford* cases, the Court of Appeals determined that the *Olson* factors did not apply because the agreement did not involve professional services. *Petry v. Cosmopolitan Spa Int'l, Inc.*, 641 S.W.2d 202, 203 (Tenn. Ct. App. 1982) (stating that "*Olson* did not overrule *Empress*" because spas are not "businesses 'of a type generally thought suitable for regulation'") (quoting *Olson*,

---

[10] The Court found that there was a genuine issue of material fact as to the plaintiff's allegations of gross negligence, and remanded the case to the trial court for a determination of that issue. 686 S.W.2d at 74.

[11] "The practice of participants in motor racing events of releasing the promoters thereof from liability and of assuming liability for any injuries sustained is expressly approved." Tenn. Code Ann. § 55-22-105 (1968) (now Tenn. Code Ann. § 55-22-103 (2015)).

558 S.W.2d at 431); *Floyd v. Club Sys. of Tenn., Inc.*, No. 01-A-01-9807-CV-00399, 1999 WL 820610, at *4 (Tenn. Ct. App. July 20, 1999) (finding, based on *Petry*, that the *Olson* test did not apply to health club contracts); *Henderson v. Quest Expeditions, Inc.*, 174 S.W.3d 730, 732–33 (Tenn. Ct. App. 2005) (upholding an exculpatory waiver for whitewater rafting because it did not involve a professional trade affecting the public interest); *Thrasher v. Riverbend Stables, LLC*, No. M2008-02698-COA-RM-CV, 2009 WL 275767, at *3 (Tenn. Ct. App. Feb. 5, 2009) (quoting *Russell v. Bray*, 116 S.W.3d 1, 6 (Tenn. Ct. App. 2003)) (upholding an exculpatory provision in a contract for boarding and training horses because the *Olson* test applied only to agreements involving a professional person).

Yet in other post-*Crawford* cases, the Court of Appeals applied the *Olson* analysis to contracts that did not involve professional services. *Lomax v. Headley Homes*, No. 02A01-9607-CH-00163, 1997 WL 269432, at *7–9 (Tenn. Ct. App. May 22, 1997) (holding an exculpatory provision in a home construction loan agreement unenforceable under the *Olson* analysis); *Hancock v. U-Haul Co. of Tenn.*, No. 01-A-01-9801-CC-00001, 1998 WL 850518, at *4–5 (Tenn. Ct. App. Dec. 10, 1998) (concluding an exculpatory provision was enforceable in a self-storage facility contract because although three of the *Olson* factors were present, the "important questions" of state regulation, reasonable alternatives for the plaintiff, and control over the plaintiff's property were lacking); *Lane-Detman, L.L.C. v. Miller & Martin*, 82 S.W.3d 284, 293–94 (Tenn. Ct. App. 2002) (applying the *Olson* analysis to a contract with a law firm to provide background checks and holding that the contract was enforceable because "at most" three of the *Olson* factors were present, both parties to the contract were sophisticated commercial entities, and the services provided were not subject to regulation); *Tompkins v. Helton*, No. M2002-01244-COA-R3-CV, 2003 WL 21356420, at *4 (Tenn. Ct. App. June 12, 2003) (applying the *Olson* factors to uphold a waiver signed at a racetrack because races are not of great importance to the public or a practical necessity; there was no disparity in bargaining power; and because the activity was voluntary, the plaintiff had not been placed under the control of the racetrack owner); *Maxwell v. Motorcycle Safety Found., Inc.*, 404 S.W.3d 469, 474–75 (Tenn. Ct. App. 2013) (citing *Henderson*, 174 S.W.3d at 733; *Tompkins*, 2003 WL 21356420 at *1) (determining that a release for a motorcycle safety course was enforceable under the *Olson* analysis because it was a voluntary activity much like a motor speedway race or whitewater rafting).

In other post-*Crawford* cases, the Court of Appeals found that exculpatory provisions were unenforceable and against public policy under the *Olson* analysis

specifically because the cases involved professional services or services that affected the public interest in a way analogous to a professional services contract. In *Russell v. Bray*, 116 S.W.3d 1, 6 (Tenn. Ct. App. 2003) (citing *Olson*, 558 S.W.2d at 430; *Parton*, 730 S.W.2d at 636), the Court of Appeals stated that the *Olson* analysis should be "limited to situations involving a contract with a professional person, rather than a tradesman." The *Russell* court found that an exculpatory provision in a home inspection contract was suitable for analysis under the *Olson* test because unlike tradesmen, home inspectors do not perform hands-on tasks but sell their expert analysis and opinions. *Id.*; *see also Carey v. Merritt*, 148 S.W.3d 912 (Tenn. Ct. App. 2004) (holding an exculpatory clause in a home inspection contract unenforceable based on the holding in *Russell*). In *Maggart v. Almany Realtors, Inc.*, No. M2005-02532-COA-R3-CV, 2007 WL 2198204 at *5 (Tenn. Ct. App. July 26, 2007) (quoting *Olson*, 558 S.W.2d at 430–31), *aff'd on other grounds*, 259 S.W.3d 700 (Tenn. 2008), the Court of Appeals analogized an exculpatory agreement between employer and employee to exculpatory provisions in business contracts with consumers, observing that the relationship was one requiring greater responsibility on the part of the employer, which would render an exculpatory release in favor of the employer "obnoxious."

There are also post-*Crawford* cases in which the Court of Appeals did not mention *Olson*, but relied solely on the common law of contracts and the language of the agreement to determine the enforceability of an exculpatory provision. *Pettit v. Poplar-Union Extended Mini-Storage*, 1995 WL 30602, at *2 (Tenn. Ct. App. Jan. 26, 1995) (holding an exculpatory provision in a self-storage contract enforceable because the language was unambiguous); *Burks v. Belz-Wilson Props.*, 958 S.W.2d 773, 777 (Tenn. Ct. App. 1997) (citation omitted) (finding a release for participation in a work-sponsored athletic event unenforceable because the wording was ambiguous and thus construed against the drafter); *Fleming v. Murphy*, No. W2006-00701-COA-R3-CV, 2007 WL 2050930, at *14 (Tenn. Ct. App. July 19, 2007) (citing *Ouzts v. Womack*, 160 S.W.3d 883, 885 (Tenn. Ct. App. 2004)) ("Under the common law of contracts, we interpret exculpatory clauses according to the plain meaning of their terms."); *Gibson v. Young Men's Christian Ass'n of Middle Tenn.*, No. M2015-01465-COA-R9-CV, 2016 WL 2937320, at *2–3 (Tenn. Ct. App. May 16, 2016) (applying the rules of contract interpretation and looking at the plain meaning of the words to find the exculpatory provision enforceable where the agreement was clear and the plaintiff was injured while using the facilities as contemplated by the parties).

Federal courts have followed suit by inconsistently applying *Olson*. *See Teles v. Big Rock Stables, L.P.*, 419 F. Supp. 2d 1003, 1008–09 (E.D. Tenn. 2006) (analyzing a contract with a horse stable under the *Olson* test and finding that it did not fall under the *Olson* exception prohibiting exculpatory provisions, although there was a genuine issue of material fact as to gross negligence that precluded summary judgment); *Farris v. KTM N. Am., Inc.*, No. 3:04-CV-354, 2006 WL 73618, at *3 (E.D. Tenn. Jan. 11, 2006) (quoting *Olson*, 558 S.W.2d at 430) (citing *Olson* in support of enforcing an exculpatory waiver for test driving motorcycles because it did not involve a service of great importance to the public, but noting that application of the *Olson* factors is typically limited to a contract for professional services).

This Court has not addressed the enforceability of exculpatory agreements since *Crawford* in 1992.[12] Because of the inconsistency in how these agreements have been reviewed, we take this opportunity to restate the proper analysis to be applied to these agreements.

## III.

Although courts throughout the country have taken numerous and varied approaches to exculpatory agreements, there are some common principles.[13] First, a party may not, for public policy reasons, exempt itself from liability for gross negligence, reckless conduct, or intentional wrongdoing. Restatement (Second) of

---

[12] This Court granted permission to appeal in *Stewart v. Chalet Village Properties, Inc.*, No. E2007-01499-COA-R3-CV, 2008 WL 836136 (Tenn. Ct. App. Mar. 31, 2008). In *Stewart*, the Court of Appeals applied the *Olson* analysis, holding that an exculpatory clause in a short-term vacation rental agreement was unenforceable because it affected the public interest and was contrary to public policy. *Id.* at *6. This Court, in an opinion designated not for publication under Tennessee Supreme Court Rule 4, agreed that an analysis under *Olson* was appropriate, but reversed and remanded the case to the trial court because the trial court had failed to apply the *Olson* factors and this Court's application of the *Olson* factors was hampered by an incomplete record. *Stewart v. Chalet Vill. Props., Inc.*, No. E2007-01499-SC-R11-CV, 2009 WL 3616611, at *1 (Tenn. Nov. 3, 2009).

[13] In two states, exculpatory agreements are unenforceable in personal injury cases. In Louisiana, agreements excluding or limiting liability for personal injuries are void and unenforceable by statute. La. Civ. Code Ann. art. 2004 (1985). Similarly, in Virginia, parties may contract for the release of liability and indemnification of third parties for property damage, but not for personal injury. *Hiett v. Lake Barcroft Cmty. Ass'n*, 418 S.E.2d 894, 895–96 (Va. 1992).

Contracts § 195 (1981); *Maxwell*, 404 S.W.3d at 476 (citing *Buckner*, 793 S.W.2d at 941).

Second, exculpatory provisions in contracts involving common carriers are unenforceable on the grounds of public policy and disparity of bargaining power. 14 Am. Jur. 2d *Carriers* § 853 (Nov. 2018 update) (noting that public policy forbids relieving carriers of responsibility based on their position of advantage over members of the public who are compelled to deal with them); *see also Trailmobile, Inc. v. Chazen*, 370 S.W.2d 840, 841–42 (Tenn. Ct. App. 1963); *Moss*, 340 S.W.2d at 904. The same rule applies to inns and airports that assume "a duty of public service" to certain segments of the public. 1A Stuart M. Speiser et al., *American Law of Torts* § 5:39 (Mar. 2018 update).[14]

Third, although exculpatory agreements are generally enforceable, in many states they are disfavored. *See* 8 *Williston on Contracts* § 19:25 (4th ed. 1993).[15]

_____

[14] *See also Maxwell Operating Co. v. Harper*, 200 S.W. 515 (Tenn. 1918); *Ellerman v. Atlanta Am. Motor Hotel Corp.*, 191 S.E.2d 295, 296 (Ga. Ct. App. 1972) (observing that the public does not have equal bargaining power when dealing with innkeepers, who are in a position to deny needed services); *Northwest Airlines, Inc. v. Alaska Airlines, Inc.*, 351 F.2d 253, 256 (9th Cir. 1965) (quoting Restatement (Second) of Contracts § 575(1)) (noting that exemption from liability for negligence is unenforceable if one of the parties has a duty to the public for which it is to be compensated and the agreement relates to negligence in the performance of that public duty).

[15] Exculpatory provisions are not disfavored in Tennessee. *See, e.g.*, *Trailmobile*, 370 S.W.2d at 844. In other states, exculpatory agreements are disfavored and strictly construed against the party seeking enforcement. *See Kissick v. Schmierer*, 816 P.2d 188, 191–92 (Alaska 1991); *Salt River Project Agric. Improvement and Power Dist. v. Westinghouse Elec. Corp.*, 694 P.2d 198, 213 (Ariz. 1984), *abrogated in part on other grounds by Phelps v. Firebird Raceway, Inc.*, 111 P.3d 1003, 1010–11 & n.5 (Ariz. 2005); *Plant v. Wilbur*, 47 S.W.3d 889, 893 (Ark. 2001); *Am. Auto. Ins. Co. v. Seaboard Sur. Co.*, 318 P.2d 84, 87–88 (Cal. Dist. Ct. App. 1957); *Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 467 (Colo. 2004); *Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734, 739 (Conn. 2005); *Sanderson v. Firestone Tire & Rubber Co.*, Civ. A. No. 89C-MR-212, 1994 WL 807899 (Del. Super. Ct. July 28, 1994); *Zinz v. Concordia Props., Inc.*, 694 So. 2d 120, 121 (Fla. Dist. Ct. App. 1997); *Fujimoto v. Au*, 19 P.3d 699, 738 (Haw. 2001); *Jesse v. Lindsley*, 233 P.3d 1, 6 (Idaho 2008); *Hawkins v. Capital Fitness, Inc.*, 29 N.E.3d 442, 447 (Ill. App. Ct. 2015); *Belger Cartage Svc., Inc. v. Holland Constr. Co.*, 582 P.2d 1111, 1119 (Kan. 1978); *Cumberland Valley Contractors, Inc. v. Bell Cnty. Coal Corp.*, 238 S.W.3d 644, 649 (Ky. 2007); *Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 923 (Minn. 1982); *Turnbough v. Ladner*, 754 So. 2d 467, 469 (Miss. 1999); *Warren v. Paragon Techs. Grp., Inc.*, 950 S.W.2d 844, 845 (Mo. 1997); *Agric. Aviation Eng'g Co. v. Bd. of Clark Cnty. Comm'rs*, 794 P.2d 710, 713 (Nev. 1990); *Barnes v. N.H. Karting Ass'n,* 509 A.2d 151, 154 (N.H. 1986); *Stelluti v. Casapenn Enters., LLC*, 1 A.3d 678, 688–90 (N.J. 2010); *Princetel, LLC v. Buckley*, 944 N.Y.S.2d 191, 193 (N.Y. App. Div. 2012); *Hyatt v.*

Fourth, most courts require that the exculpatory language be unequivocal and clear. *Williston* § 19:22. An exculpatory clause must "clearly, unequivocally, specifically, and unmistakably" state the intention to exempt one of the parties from liability for its own negligence. *Id.* § 19:25; *see also, e.g., Parton*, 730 S.W.2d at 638 (holding an exculpatory clause invalid based on a lack of evidence that it had been pointed out to the plaintiff or that "a person of ordinary intelligence and experience" would understand that the agreement relieved the defendant of all liability); *Sirek v. Fairfield Snowbowl, Inc.*, 800 P.2d 1291, 1295 (Ariz. Ct. App. 1990) (stating that exculpatory language should alert the party signing the release that "it is giving up a very substantial right"); *Sanislo v. Give Kids the World, Inc.*, 157 So. 3d 256, 261 (Fla. 2015) (holding exculpatory agreements enforceable if the language is "so clear and understandable that an ordinary and knowledgeable person will know what he or she is contracting away").

Fifth, most jurisdictions do not enforce exculpatory provisions that are contrary to public policy. There is no bright line rule defining when a provision is contrary to public policy, but *Williston* suggests that whether an exculpatory agreement is void as against public policy depends on:

> all of the facts and circumstances surrounding the making of the agreement; society's expectations; the identity and nature of the parties involved, including their relative education, experience, sophistication, and economic status; and the nature of the transaction itself, including the subject matter, the existence or absence of competition, the relative bargaining strength and negotiating ability of the economically weaker party, and the terms of the agreement itself, including whether it was arrived at through arm's length negotiation or on terms dictated by the stronger party and on an adhesive, take-it-or-leave-it basis.

*Williston* § 19:22.

*Mini Storage on the Green*, 763 S.E.2d 166, 169 (N.C. Ct. App. 2014); *Konrad ex rel. McPhail v. Bismarck Park Dist.*, 655 N.W.2d 411, 413 (N.D. 2003); *Schmidt v. United States*, 912 P.2d 871, 874 (Okla. 1996); *Mann v. Wetter*, 785 P.2d 1064, 1066 (Or. Ct. App. 1990); *Fisher v. Stevens*, 584 S.E.2d 149, 152 (S.C. Ct. App. 2003); *Housing Vermont v. Goldsmith & Morris*, 685 A.2d 1086, 1089 (Vt. 1996); *Atkins v. Swimwest Family Fitness Ctr.*, 691 N.W.2d 334, 338 (Wis. 2005).

This Court adopted the *Olson* factors based on the *Tunkl* analysis. *Tunkl*, however, is the minority approach, with only five other states currently relying on the *Tunkl* factors to determine the enforceability of exculpatory provisions.[16] Courts in several states have observed that the factors fail to consider the totality of circumstances and, as a result, are overly rigid and arbitrary. *See Wolf v. Ford*, 644 A.2d 522, 527 (Md. 1994) (declining to adopt *Tunkl* because of concern that the six fixed factors may be too rigid and arbitrary); *Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 924 (Minn. 1982) (noting that although a number of courts cite *Tunkl* with approval, post-*Tunkl* cases generally consider disparity in bargaining power and whether the agreement involves a public or essential service); *Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734, 744 (Conn. 2005) (stating that public interest cannot adequately be defined within the four corners of a formula, and thus the analysis should be guided but not limited by the *Tunkl* factors).

After reviewing precedent in this state and across the country, we conclude that the public policy in Tennessee has historically favored freedom of contract. Thus, contracts exempting one party from liability for negligence are not disfavored and are generally enforceable. *Olson*, 558 S.W.2d at 430. That said, not

---

[16] *See Morgan v. S. Cent. Bell Tel. Co.*, 466 So. 2d 107, 117 (Ala. 1985); *City of Santa Barbara v. Superior Court*, 161 P.3d 1095, 1099–1102 (Cal. 2007); *Bodyslimmer, Inc. v. Sanford*, 398 S.E.2d 840, 841 (Ga. Ct. App. 1990); *Glassford v. Brickkicker*, 35 A.3d 1044, 1050 (Vt. 2011); *Vodopest v. MacGregor*, 913 P.2d 779, 786 (Wash. 1996). Courts in other states have cited *Tunkl* and applied the *Tunkl* factors in certain cases without adopting them. *See Cudnik v. William Beaumont Hosp.*, 525 N.W.2d 891, 895 (Mich. Ct. App. 1994) (citing *Tunkl* as the leading case addressing an exculpatory agreement between a hospital and a patient, and finding that the agreement at issue fulfilled all of the *Tunkl* criteria); *Schutkowski v. Carey*, 725 P.2d 1057, 1060 (Wyo. 1986) (citing the four-part test adopted by the Colorado Supreme Court and applying the *Tunkl* factors to determine whether a private recreational business involved a public duty or was a matter of great necessity as required by that four-part test); *Banfield v. Louis*, 589 So.2d 441, 446 (Fla. Dist. Ct. App. 1991) (quoting *Bituminous Cas. Corp. v. Williams*, 17 So.2d 98, 102 (Fla. 1944)) (applying the *Tunkl* factors in finding that the plaintiff had failed to show sufficient evidence to invalidate an exculpatory agreement based on "'great prejudice to the dominant public interest'"). Several other states use the *Tunkl* factors to guide their analysis of public policy or the public interest as one part of a multi-part test. *See Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981) (using the *Tunkl* factors to determine whether the public interest prong of Colorado's four-part test has been met); *Courbat v. Dahana Ranch, Inc.*, 141 P.3d 427, 438–39 (Haw. 2006) (determining the public interest element of Hawaii's three-part test by application of the *Tunkl* factors); *Berlangieri v. Running Elk Corp.*, 76 P.3d 1098, 1109–10 (N.M. 2003) (adopting the *Tunkl* factors for guidance, but noting that they are only "indicators" helpful to determine "the larger question of whether enforcement of the release would be unjust"); *Pearce v. Utah Athletic Found.*, 179 P.3d 760 (Utah 2008) (adopting the *Tunkl* factors to determine whether the public interest prong of Utah's two-part test has been met), *abrogated in part on other grounds by Penunuri v. Sundance Partners, Ltd.*, 423 P.3d 1150 (Utah 2017).

all exculpatory agreements should be enforceable, and courts should determine their enforceability by consideration of the circumstances of the parties, the language used in the agreement, and the public interest. While the factors adopted in *Olson* remain instructive and may be considered when relevant, the *Olson* approach is too rigid, fails to consider all the relevant circumstances, and is followed by only a handful of jurisdictions.

We, therefore, need to restate our approach to determining the validity of exculpatory agreements. After surveying the factors adopted by courts in other states[17] and considering Tennessee precedent, we hold that the enforceability of an

---

[17] *See Plant v. Wilbur*, 47 S.W.3d 889, 893–94 (Ark. 2001) (three factors: public interest considerations; equality of bargaining power; clarity of language); *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981) (four factors: existence of a duty to the public (determined by the *Tunkl* factors); the nature of the service performed; whether the agreement was fairly entered into; clear and unambiguous language); *Moore v. Waller*, 930 A.2d 176, 181–83 (D.C. 2007) (three factors: whether the exculpatory language is clear and unambiguous; bargaining power, specifically including whether the contract involves a necessary service; public policy); *Sanislo*, 157 So.3d at 260 (two factors: unambiguous language; public policy); *Courbat v. Dahana Ranch, Inc.*, 141 P.3d 427, 438–39 (Haw. 2006) (three factors: not violative of a statute; public interest (defined by *Tunkl*); equality of bargaining power); *Jesse v. Lindsley*, 233 P.3d 1, 6 (Idaho 2008) (two factors: bargaining power; existence of a public duty); *Hawkins v. Capital Fitness, Inc.*, 29 N.E.3d 442, 446–47 (Ill. App. Ct. 2015) (three factors: disparity in bargaining power; public policy; social relationship between the parties that "militates against upholding the clause"); *McAdams v. Foxcliff Estates Cmty. Ass'n*, 92 N.E.3d 1144, 1150 (Ind. Ct. App. 2018) (four factors: bargaining power; unconscionability; whether the contract affects public interest; public policy); *B.J.'s Wholesale Club, Inc. v. Rosen*, 80 A.3d 345, 351–52 (Md. 2013) (three factors: clear and specific language; bargaining power; whether the contract affects the public interest); *Xu v. Gay*, 668 N.W.2d 166, 171–73 (Mich. 2003) (two factors: whether the release was fairly and knowingly made; explicit and unambiguous language); *Schlobohm*, 326 N.W.2d at 923 (two factors: bargaining power; whether the contract affects the public interest); *Turnbough v. Ladner*, 754 So. 2d 467, 469 (Miss. 1999) (two factors: whether the agreement was "fairly and honestly negotiated and understandingly entered into"; clear and precise language); *Stelluti v. Casapenn Enters., LLC*, 1 A.3d 678, 689 (N.J. 2010) (four factors: whether the agreement affects the public interest; existence of a legal duty to perform the service; no public utility or common carrier is involved; bargaining power/unconscionability); *Princetel, LLC v. Buckley*, 944 N.Y.S.2d 191, 193 (N.Y. App. Div. 2012) (three factors: no contravening public policy; clear, unequivocal language; the existence of a special relationship between the parties "such that an overriding public interest prohibits enforcement"); *Hyatt v. Mini Storage on the Green*, 763 S.E.2d 166, 169 (N.C. Ct. App. 2014) (three factors: not violative of a statute; bargaining power; public interest); *Schmidt v. United States*, 912 P.2d 871, 874 (Okla. 1996) (three factors: clear and unambiguous language; bargaining power; public policy); *Topp Copy Prods., Inc. v. Singletary*, 626 A.2d 98, 99 (Pa. 1993) (four factors: public policy; the contract relates entirely to the parties' private affairs; bargaining power; clear and unambiguous language); *K.N. v. Life Time Fitness, Inc.*, No. 2:16-cv-39, 2018 WL 1472483 at *6 (D. Utah March 23, 2018) (citing *Pearce v. Utah Athletic Found.*, 179 P.3d 760 (Utah 2008)) (two factors: clear and unambiguous language; public interest). *Roberts v. T.H.E. Ins. Co.*, 879 N.W.2d 492, 501–02 (Wis. 2016) (three-factor public policy analysis: exculpatory language must not be overly broad and all-inclusive; adequate notice of the waiver's nature and significance; bargaining power); *Massengill v.*

exculpatory agreement should be determined by considering the totality of the circumstances and weighing these non-exclusive factors: (1) relative bargaining power of the parties; (2) clarity of the exculpatory language, which should be clear, unambiguous, and unmistakable about what the party who signs the agreement is giving up; and (3) public policy and public interest implications. The totality of the facts and circumstances of each case will dictate the applicability of and the weight to be given to each of these factors. The factors need not be weighed equally in any given case – rather, the analysis should involve balancing each of these considerations given the facts and circumstances surrounding the formation of the agreement. In addition, we hold that there is no "professional services criterion" that restricts application of this analysis to contracts for professional services. Therefore, we overrule *Parton*, 730 S.W.2d 634; *Petty*, 818 S.W.2d 743; *Petry*, 641 S.W.2d 202; Floyd, 1999 WL 820610; *Henderson*, 174 S.W.3d 730; *Thrasher*, 2009 WL 275767; *Russell*, 116 S.W.3d 1; *Carey*, 148 S.W.3d 912; and any other previous decisions to the extent these cases conflict with our holding.

We next turn to defining these factors to provide additional guidance in their application to the facts and circumstances of each case.

*Relative bargaining power.* Although there is no precise rule by which to define sufficient disparity in bargaining power between the parties to invalidate an exculpatory agreement, two key criteria are the importance of the service at issue for the physical or economic well-being of the party signing the agreement and the amount of free choice that party has in seeking alternate services. *Schmidt v. United States*, 912 P.2d 871, 874 (Okla. 1996). For example, a standardized form offered on a take-it-or-leave-it basis may be invalid if there was great disparity of bargaining power, no opportunity for negotiation, and the services could not reasonably be obtained elsewhere. *Schlobohm*, 326 N.W.2d at 924.[18]

---

*S.M.A.R.T. Sports Med. Clinic, P.C.*, 996 P.2d 1132, 1136 (Wyo. 2000) (four factors: the existence of a duty to the public; the nature of the service performed; whether the agreement was fairly entered into; clear and unambiguous language).

[18] *See also Hyatt v. Mini Storage on the Green*, 763 S.E.2d 166, 171 (N.C. Ct. App. 2014) (quoting *Hall v. Sinclair Ref. Co.*, 89 S.E.2d 396, 398 (N.C. 1955)) (defining disparity in bargaining power sufficient to invalidate an exculpatory agreement as bargaining power unequal to the extent that the releasing party must either accept the agreement or forgo a service important to him that is, for all practical purposes, not obtainable elsewhere); *Crowell v. Hous. Auth. of Dallas*, 495 S.W.2d 887, 889 (Tex. 1973) (concluding that if one party is at such a disadvantage in bargaining power that he is practically compelled to sign the release, it will be unenforceable).

*Clarity of language.* The language of an exculpatory agreement must clearly and unequivocally state a party's intent to be relieved from liability, and the wording must be "so clear and understandable that an ordinary and knowledgeable person will know what he or she is contracting away." *Sanislo*, 157 So. 3d at 260–61.[19] The language must also alert the party agreeing to the exculpatory provision that the provision concerns a substantial right. *Sirek*, 800 P.2d at 1295. The language in the agreement should not be so broad as to relieve the exculpated party from liability for any injury for any reason. *Burks*, 958 S.W.2d at 777 (holding exculpatory provision relieving the defendant "from any and all liability . . . relating to participation in these events" unenforceable as overly broad and ambiguous); *Roberts v. T.H.E. Ins. Co.*, 879 N.W.2d 492, 503 (Wis. 2016) (citing *Richards v. Richards*, 513 N.W.2d 118, 121 (Wis. 1994)).[20] Ambiguous language will be construed against the party that drafted the agreement. *Burks*, 958 S.W.2d at 777.

*Public policy and the public interest.* The third factor, public policy and the public interest, is the most difficult to articulate. Public policy has been defined as "'that principle of law under which freedom of contract or private dealings is restricted by law for the good of the community.'" *Roberts*, 879 N.W.2d at 501–02 (quoting *Atkins v. Swimwest Family Fitness Ctr.*, 691 N.W.2d 334, 339 (Wis. 2005)). A private contract violates public policy if it conflicts with the constitution, statutes, or judicial decisions of this state or tends to be harmful to the public good, public interest, or public welfare. *Spiegel v. Thomas, Mann & Smith, P.C.*, 811 S.W.2d 528, 530 (Tenn. 1991). As this Court explained in *Crawford*, without a declaration in the constitution or the statutes of Tennessee, a judicial declaration of public policy is within the province of the courts. 839 S.W.2d at 759. Public policy is also determined by societal expectations that are flexible and change over time. *See Wolf*, 644 A.2d at 527–28 ("The ultimate determination of what constitutes the

---

[19] *See also Turnbough v. Ladner*, 754 So. 2d 467, 469 (Miss. 1999) (stating that the intention to release one party from liability for negligence must be expressed in "clear and unmistakable language" and "should express as clearly and precisely as possible the *extent* to which a party intends to be absolved from liability").

[20] *See also Turnbough*, 754 So. 2d at 469 ("We do not sanction broad, general, 'waiver of negligence' provisions, and strictly construe them against the party asserting them as a defense."); *Richards v. Richards*, 513 N.W.2d 118, 122 (Wis. 1994) (finding that the overly broad language of the release "raised questions about its meaning and demonstrate[d] its one-sidedness" as unreasonably favorable to the released party). *But see Huber v. Hovey*, 501 N.W.2d 53, 54–55 (Iowa 1993) (upholding broad release from "any and all" loss, damage, or claim whether caused by negligence or otherwise).

public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations.").

Whether the public interest is affected may be determined by considering whether a party to the transaction has a public service obligation, such as a public utility, common carrier, or innkeeper. *Wolf*, 644 A.2d at 526. This analysis also includes transactions that are not as readily defined, but are so important to the public good that an exculpatory clause would be contrary to society's expectations. *Id.* (quoting *Md.-Nat'l Capital Park & Planning Comm'n v. Wash. Nat'l Arena*, 386 A.2d 1216, 1228 (Md. 1978)); *see also Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734, 744 (Conn. 2005) (citations omitted) (agreeing with the Maryland and Vermont Supreme Courts that the public interest must be determined based on the totality of the circumstances and that the analysis, guided but not limited by *Tunkl*, "is informed by any other factors that may be relevant given the factual circumstances of the case and current societal expectations"); *Williston* § 19:22.

In determining whether the service involved is a public or essential service, courts should consider whether it is a type of service generally considered suitable for public regulation. *Schlobohm*, 326 N.W.2d at 925–26. And in deciding whether enforcement of an exculpatory provision would be against public policy, courts should consider whether the services involved are of great importance to the public, which are a practical necessity for some members of the public. *Id.*; *see also Plant v. Wilbur*, 47 S.W.3d 889, 893 (Ark. 2001) (upholding release signed by a spectator at a car race because that activity involved a narrow segment of the public, unlike a public utility, common carrier, or "a similar entity connected with the public interest").

**IV.**

In applying this restated analysis to the facts before us, we take the strongest legitimate view of the evidence in favor of Mr. Copeland as the non-moving party for summary judgment and allow all reasonable inferences in his favor. *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 844–45 (Tenn. 2010); *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)).

We begin with the first factor – disparity in bargaining power. Mr. Copeland was a seventy-seven-year-old hospital patient recovering from knee replacement surgery who needed to go to a follow-up appointment at his doctor's office. Mr.

Copeland did not select, hire, or pay MedicOne. Instead, the hospital where Mr. Copeland was a patient arranged for his transportation with MedicOne. The MedicOne driver presented Mr. Copeland with a pre-printed, two-sided document containing two different forms – the Run Report and the Agreement – which Mr. Copeland had limited time to review and sign before being transported to his doctor's appointment. The Agreement consisted of nine single-spaced paragraphs, including three paragraphs of exculpatory language. The MedicOne driver spent only nineteen minutes at the hospital, which began with his arrival, and included going to Mr. Copeland's room, pushing Mr. Copeland in a wheelchair to the hospital entrance, getting him into the van, loading his walker into the back of the van, and having Mr. Copeland review and sign the two forms.

The MedicOne driver presented the Agreement to Mr. Copeland on a take-it-or-leave-it basis with the expectation that he would sign it. The driver did not understand the implications of the Agreement, could not have explained it if asked, had no authority to alter it, and would not have transported Mr. Copeland to his appointment if he had not signed the document.

Mr. Copeland had a practical necessity to get to his medical appointment. He had the difficult choice of signing the Agreement or delaying or forgoing his medical care that day. Mr. Copeland's situation was analogous to the difficult choice presented to the plaintiff in *Wofford v. M.J. Edwards & Sons Funeral Home, Inc.*, 490 S.W.3d 800 (Tenn. Ct. App. 2015). There, a funeral home presented the plaintiff with a contract for funeral services after her father's body had been embalmed. Relying on *Buraczynski v. Eyring*, 919 S.W.2d 314 (Tenn. 1996), the *Wofford* court ruled that the arbitration clause in the contract was unenforceable because it was a contract of adhesion, offered on a take-it-or-leave-it basis, and the plaintiff's failure to sign the agreement would have interrupted the rendition of services and caused delay, resulting in a "difficult choice." 490 S.W.3d at 824. Recognizing that the *Buraczynski* analysis rests on the critical finding of a unique relationship built on trust (such as the doctor-patient relationship in *Buraczynski*), the *Wofford* court found that the plaintiff had no realistic choice other than to sign the contract, and that asking her to stop the funeral services at that point would be like asking her "to swap horses midstream." *Id.* at 816. Mr. Copeland may not have had a preexisting relationship with MedicOne that was "unique and built on trust," but he did have a hospital-patient relationship with HealthSouth, the entity that had arranged for his transportation by MedicOne. Mr. Copeland also faced the same kind of difficult choice – refusing to sign the Agreement, offered on a take-it-or-leave-it basis that would have

potentially interrupted and caused a delay in his medical care by requiring him to reschedule his appointment or, as the Court of Appeals suggested, calling a taxi. In our view, asking Mr. Copeland to make such a choice would be like asking him to "swap horses in midstream." *Id.* There is ample evidence in the record of relative disparity in the parties' bargaining power.

We now turn to the second factor – the clarity of the Agreement's exculpatory language. Much of the exculpatory language appears in bold print and all capital letters. Even so, although portions of paragraphs three and four purport to limit the exculpatory language in those paragraphs to simple negligence by expressly excluding gross negligence and willful misconduct, this limiting language begins by stating, "WITHOUT LIMITATION OF THE FOREGOING . . . ." The "foregoing" in paragraph three reads:

> Client does hereby release and forever discharge MedicOne . . . from any and all claims, suits, rights, interests, demands, actions, causes of action, liabilities, accident, injury (including death), costs, fees, expenses and any and all other damages or losses of any kind whatsoever, whether to person or property . . . arising out of, incidental to, associated with, or in any way related to any transportation services provided to Client by MedicOne.

Similarly, the "foregoing" in paragraph four reads:

> CLIENT WILL INDEMNIFY, DEFEND AND HOLD HARMLESS MEDICONE RELATED PARTIES FROM AND AGAINST ANY AND ALL CLAIMS ASSERTED BY CLIENT, ANY PERSON OR ENTITY RELATED TO CLIENT OR ASSERTING A CLAIM BY OR THROUGH CLIENT, OR ANY OTHER THIRD PARTIES OR ENTITIES WHICH, IN ANY WAY, ARISE OUT OF, ARE INCIDENTAL TO, ASSOCIATED WITH, OR IN ANY WAY RELATED TO ANY TRANSPORTATION SERVICES PROVIDED TO CLIENT BY MEDICONE.

Paragraph six contains no limitation for claims of gross negligence or willful misconduct, but purports to release MedicOne from "any liability, damage or expense arising out of any claim in any way associated with or relating to any transportation services provided to Client by MedicOne."

Courts in many jurisdictions, including Tennessee, have found such unlimited language to be so overly broad as to render the provisions unenforceable. *See Burks*, 958 S.W.2d at 777 (holding release "from any and all liability claims, demands, actions or causes of action whatsoever, arising out of or any injury, illness loss or damage including death relating to participation in these events" unenforceable because it would "extend its exculpation to unbounded limits"); *Fisher v. Stevens*, 584 S.E.2d 149, 152–53 (S.C. Ct. App. 2003) (finding a waiver signed at a racetrack to be overly broad and unenforceable based on public policy because the waiver released from liability "any persons in any restricted area"); *Jesse v. Lindsley*, 233 P.3d 1, 7–8 (Idaho 2008) (holding exculpatory clause in a residential lease unenforceable because it purported to release the landlord from liability "for any occurrence of any nature"); *Alack v. Vic Tanny Int'l of Mo., Inc.*, 923 S.W.2d 330, 337–38 (Mo. 1996) (finding exculpatory clause unenforceable based on its ambiguity because the clause did not specifically state that the customer was releasing the health club from liability for negligence and used words like "any" and "all" injuries and claims, which could include intentional or grossly negligent conduct that cannot be excluded from liability); *Roberts*, 879 N.W.2d at 503 (holding waiver unenforceable because it was too broad and all-inclusive, ambiguous about whether it covered injury while waiting in line for the activity, and was a standard pre-printed form with no opportunity to negotiate).

We find the exculpatory language in the Agreement to be overly broad and ambiguous. Although the Agreement also contains a severability clause,[21] the three paragraphs containing broad, all-encompassing exculpatory language combined with the severability paragraph do not make it clear and unmistakable what Mr. Copeland was giving up by signing the Agreement, especially during the limited time he was given to read and comprehend the document.

---

[21] The severability clause appears in paragraph 5 of the Agreement:

5. The invalidity or unenforceability of any particular provision of this Agreement shall not affect any other provision hereof, and in the event that any provision hereof is found by a proper authority to be invalid or unenforceable, this Agreement shall be construed in all respects as if such invalid or unenforceable provision had never comprised a part hereof and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the invalid or unenforceable provision or by its severance here from. Furthermore, in lieu of such invalid or unenforceable provision, there shall be automatically hereto and as a part hereof a provision as similar in terms and intent to such invalid and unenforceable provision as may be possible and be legal, valid and enforceable.

Finally, we turn to the third factor – public policy and public interest implications. Mr. Copeland's appointment with his doctor was a medical necessity. That practical necessity distinguishes this case from those involving purely voluntary or recreational activities, which generally do not affect the public interest or raise public policy concerns. *Maxwell*, 404 S.W.3d at 475; *Henderson*, 174 S.W.3d at 733. Although public policy and the public interest are difficult concepts to define, some relationships require greater responsibility of one of the parties. *Olson*, 558 S.W.2d at 430. MedicOne was in a position of greater responsibility when it undertook to transport Mr. Copeland to and from his doctor's office. Mr. Copeland had limited time to read and comprehend the overly broad and ambiguous Agreement and the Run Report. Under these circumstances, it is not reasonable to conclude that Mr. Copeland could have just called a taxi or rescheduled his appointment. Our public policy protects patients and clients of professionals, residential tenants, employees, bank customers, and homebuyers from exculpatory provisions. It only makes sense that our public policy should also protect a hospital patient under the circumstances faced by Mr. Copeland when he signed the Agreement. Based on the circumstances of the parties, including contemporary societal expectations, we conclude that enforcement of the Agreement against a member of the public in Mr. Copeland's position would be contrary to the public interest.

## V.

In sum, after considering the totality of the circumstances and weighing the inequality in the relative bargaining power of the parties, the lack of clarity of the exculpatory language, and the public policy and public interest implications, we hold that, as a matter of law, the exculpatory provisions in the Agreement signed by Mr. Copeland are unenforceable and do not bar his claim against MedicOne. We vacate the judgment of the trial court, reverse the judgment of the Court of Appeals, and remand to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal to MedicOne Medical Response Delta Region, Inc., for which execution may issue if necessary.

_____
SHARON G. LEE, JUSTICE

- 22 -